## Richmond

## "AUTOMATIC" SPRINKLER CORPORATION OF AMERICA
### v.
## COLEY & PETERSEN, INC., et al.

January 12, 1979.

Record No. 770728.

Present: Carrico, Harrison, Cochran, Harman, Poff and Compton, JJ.

*Wilbur L. Hazlegrove; William D. Elliot (Hazlegrove, Dickinson & Rea, on briefs), for plaintiff in error.*

*Ronald M. Ayers; John D. Epperly (Diane McQ. Strickland; Junius D. Warren; Woods, Rogers, Muse, Walker & Thornton; Broaddus, Epperly, Broaddus, Beck and Warren, on brief), for defendants in error.*

COMPTON, J., delivered the opinion of the Court.

This appeal arises from a contract to construct a public facility. Following an incident which resulted in damage to portions of the structure, two subcontractors sued a third subcontractor for recovery of costs and expenses incurred during repair of the damage. Upon review, we consider whether the plaintiffs below had standing to sue, whether contractual waiver provisions barred the plaintiffs' actions, and whether certain items of damage were properly admitted in evidence.

In 1968, the City of Roanoke entered into a lump sum contract in the amount of $11 million with Nello L. Teer Company, the general contractor, for construction of the Roanoke Civic Center, consisting of an Auditorium, Coliseum and Exhibit Hall. Thereafter, Teer entered into separate written subcontracts with plaintiff-appellee Coley & Petersen, Inc., plaintiff-appellee Clear-Bullock Electrical Company, Inc. and defendant-appellant "Automatic" Sprinkler Corporation of America for installation of the mechanical work (heating, air-conditioning, plumbing), electrical work and the automatic sprinkler system respectively. Several years later, and before final completion of the project, a cast iron pipe installed by the defendant broke causing water damage to some of the mechanical and electrical equipment in a basement below the Auditorium. The plaintiffs repaired the damage and when the defendant refused their demands for reimbursement of the amounts of their claimed losses, these two actions in tort, filed separately but later consolidated, followed in 1972. Coley & Petersen initially sought to recover approximately $15,000 while Clear-Bullock's suit was for almost $36,000.

Evidentiary hearings by the trial court sitting without a jury were held in 1976 upon defendant's several special pleas and motions. At these hearings, the court considered the questions of

standing and waiver, ruling adversely to defendant. Later in 1976, a four-day jury trial was held on the merits at which responsibility for the damage was fixed upon the defendant and damages were assessed in favor of the plaintiffs. Coley & Petersen was awarded $8,934.47 and Clear-Bullock recovered $24,770.59. Subsequently, the trial court overruled defendant's post-trial motions and we granted defendant a writ of error to the February 1977 judgment orders confirming the verdicts.

We will first examine the questions of standing to sue and waiver. All the evidence pertaining to these issues was taken at the pre-trial hearings.

The record reveals that immediately following the March 1968 execution of the prime contract between the City and Teer, the general contractor entered into the three subcontracts, containing identical basic provisions, with the parties to this action. The work proceeded for a period of about four years. Final completion and the City's final acceptance of the project occurred during February of 1972.

In early 1971, in part because the City had "booked at least one and maybe more activities" for the Civic Center in 1971 which would have been "extremely costly" to cancel, the City and Teer agreed that the City would be permitted to use certain parts of the building provided the architect made an inspection and issued a certificate of substantial completion. Accordingly on March 24, 1971, such a certificate was issued and March 25, 1971 was established as the date of substantial completion. The certificate further provided that the City had the responsibility to purchase and maintain insurance to protect itself, Teer, the public, and "all other parties from claims or losses which may arise out of or result from [the City's] occupancy and use" of the completed portions of the project. On March 19, 1971, the City had obtained an insurance policy providing coverage for the Civic Center against the peril of fire, with extended coverage. Effective March 25, 1971, the builder's risk insurance policy for the project obtained by Teer was cancelled. Teer then obtained, as required by the certificate of substantial completion, an "Insurance Installation Floater Policy" providing coverage for losses which might arise from its operations in completing the work. According to the testimony and the exhibits, the Civic Center "opened" on March 27, 1971 and at least six more events were held there prior to the date the damage in issue happened.

On May 18, 1971, a break occurred in the flange of the six-inch sprinkler main at a point just inside the interior wall of the basement of the Auditorium. The basement area was flooded and a substantial amount of equipment and other installed work of the plaintiffs in the area was heavily damaged. At the time, although plaintiffs had completed substantially all their work, neither had fully performed its contract. Each had remaining responsibilities to Teer under the subcontracts. The defendant had finished its work of installing the sprinkler system prior to March 25, 1971.

The day after the damage occurred, Teer notified defendant and its liability insurance carrier that "Automatic" Sprinkler was required under its subcontract to repair any damage it had caused as a result of its work. Defendant refused to authorize the several subcontractors to proceed with the repairs and on May 28, 1971, Teer issued written notice to the plaintiffs that under their contracts they had the duties to protect their work from damage until final acceptance, to make any and all repairs necessary and to prepare all work acceptable to the architect and to the owner. Article 20 of the subcontracts provided:

> The Subcontractor will be responsible for the care and protection of his work until the final inspection and acceptance by the Architect and/or Owner. The Contractor assumes no responsibility for the collection of any charges claimed by this Subcontractor against another Subcontractor and/or Supplier.
>
> Any damage inflicted by another Subcontractor shall be repaired by this Subcontractor and be billed on a weekly basis to the Subcontractor responsible for the damage. The party responsible for the damage must be notified, in writing, before repairs or corrective work is done.

Pursuant to that provision, Teer advised both plaintiffs in the May 28 letter that

> if your work is damaged by others or by another subcontractor, the burden is upon you

> to collect the cost of such damages from him.
> You will note that work should not start until
> you have given him proper *written* notice.

The letter concluded with the request that plaintiffs "act immediately," as outlined in the letter, because "expedient completion of the work is an essential element of [Teer's] contract with the owner." The plaintiffs then proceeded to repair the damage, after giving written notice to defendant. Subsequently, defendant failed to reimburse plaintiffs for any of the expenses incurred.

The first question is whether the trial court was correct in ruling that the plaintiffs could bring these tort actions against the defendant. Asserting that the court below erred, and relying on several Virginia cases, defendant contends that because the project had been substantially completed, neither plaintiff had any "legal interest in the completed mechanical and electrical work and no standing to maintain these actions." Defendant asserts that "the General Conditions of the prime contract expressly provided for passage of title to supplies and materials as and when they were incorporated in the work" and argues that the certificate of substantial completion between the City and Teer "expressly provided that the risk of loss or damage to the Civic Center would be upon the City of Roanoke from and after 12:01 a.m. on March 25, 1971." The "essential purpose", the defendant continues, "of the certificate of substantial completion was to set at rest all questions of title, possession and risk of loss as to the completed aspects of the work."

The plaintiffs, on the other hand, contend that defendant has failed to carry its burden of proof on the standing issue and that the cases relied on by defendant are not applicable here. Plaintiffs urge that because they were still performing work on the project pursuant to the subcontracts at the time the damages were incurred and because they were required by the terms of the subcontracts, specifically Article 20, to effect all necessary repairs, they had standing to sue for the cost of repairs. We agree with the plaintiffs.

The uncontradicted evidence established that on the day the pipe burst the plaintiffs each had personnel at the project site performing work required by the respective subcontracts. Although the portion of completion of the plaintiffs' two contracts exceeded 99 per cent, the fact remained that under the clear terms of the subcontracts, the plaintiffs were responsible for the care and

protection of their work until the final inspection and acceptance. Such event had not occurred when the water main ruptured. Furthermore, when damages occurred the general contractor ordered both plaintiffs to immediately repair the damage. Again, under Article 20, each had no option but to comply with Teer's directive because the contract specifically provided that such damage "shall be repaired" by the respective plaintiffs.

At the bar defendant argued that Article 20 "does not survive substantial completion." Thus, defendant says, Teer and its subcontractors had no responsibility to repair subsequent damage to installed work not caused by them, even though some work remained to be done and final payment had not been made by the owner. The answer to that argument is that the subcontracts binding the plaintiffs did not so provide and there is no basis upon which such a provision can be read into the contracts.

Defendant relies principally upon *Atlantic & Danville Ry.* v. *Delaware Contruction Co.,* 98 Va. 503, 37 S.E. 13 (1900), and *Clark* v. *Franklin,* 34 Va. (7 Leigh) 1 (1836). Neither case is apposite. The issue in each was whether the contract was severable or entire, a question not involved here. In the more recent case, full completion of the project, not mere substantial completion, was assumed. In neither case did the contract have a provision similar to Article 20. And in neither was the controversy among subcontractors.

Consequently, we hold that defendant failed to establish that plaintiffs did not have sufficient standing to maintain these suits.

The second question is whether the trial court erred in deciding that, in respect to these losses, the plantifs were not bound by certain contractual provisions for insurance, release and waiver of claims between the City and Teer. The defendant contends that if the trial court correctly held that plaintiffs had a sufficient interest at the time of the losses to maintain these actions, then it must follow that the prime contract between the City and Teer, as well as the subcontracts, remained executory and uncompleted. Thus, defendant argues, focusing on provisions of the prime contract, that there was an obligation upon the City or Teer, or both, to insure the interest in the work in progress of the City, Teer, and all subcontractors against the risk of loss or damage by fire, with extended coverage.

Pointing to the General Conditions of the prime contract which required the City to maintain such insurance, and an amendment which required Teer to procure such insurance, the defendant contends that "under the scheme of the contract", the proceeds of

such insurance were to be applied to repair or restore any insured loss "with the owner or contractor acting as trustee of the proceeds for the benefit of the parties insured, as their interests might appear." Defendant takes the position that damage caused by the broken sprinkler pipe gave rise to an insured loss which, on proper claim, should have been paid to the City by the City's insurer.

Defendant additionally notes that the General Conditions of the prime contract expressly waived any claim that either the City or Teer might have against the other to the extent that the loss was covered by insurance. It contends that similar waivers, under the contract provisions, "were expressly required from all sub-tier contractors." It argues that each subcontract expressly incorporated the applicable provisions of the General Conditions of the prime contract "including those which expressly waived any claim for recovery of damages resulting from an insured loss." Contending that the property insurance provisions of the prime contract were for the benefit of all the subcontractors, defendant asserts that each of the subcontractors as third-party beneficiaries was entitled to enforce the benefits of the agreement subject to any existing limitation against claims. It argues that here the limitation was the covenant not to sue when an insured loss occurred. Defendant says that neither plaintiff could enjoy the benefits of the agreement between the City and Teer while at the same time rejecting the burdens thereof. Here, defendant maintains, the covenant not to sue was "incorporated by reference in each of the subcontracts and expressly extended to each subcontractor as a benefit under the prime contract." Accordingly, defendant urges that the waiver of claims provisions of the contracts precluded these suits by two subcontractors against a third. We reject both prongs of defendant's argument on this second issue.

In disposing of the first issue we have just decided that the contracts were executory and uncompleted at the time of the losses. So, to that extent, we agree with the initial portion of defendant's argument. But, contrary to defendant's contention, we do not think there was any insurance coverage available to plaintiffs under the policies obtained by either the City or Teer to cover the losses occasioned by defendant's negligence.

The testimony of defendant's own witnesses established that the City's insurance was limited to claims or losses arising out of the occupancy of the Civic Center, and the rupture of the water line was not a result of the City's "occupancy or use" of the building. An employee of the City's property insurer testified on cross-examina-

tion without objection that the policy did not insure a subcontractor who might be damaged by reason of the bursting pipe but that only the City was insured. The witness further stated that the policy did not cover a claim of one subcontractor against the other. Additionally, an examination of the contract documents confirms that the loss by a subcontractor on the project was not meant to be covered by insurance secured by either Teer or the City. Applicable provisions of the subcontracts required the subcontractor to indemnify and hold Teer harmless against all liability from actions for injury to persons or property by carrying the necessary insurance and, further, to insure its own risks against project casualties. Also, the subcontracts prohibited the making of any claim by a subcontractor against Teer as the result of any acts or omissions of other subcontractors. And, most importantly, Article 20 required the subcontractor to repair property damaged by another subcontractor and to charge the negligent subcontractor with the cost of repairs. As the plaintiffs argue, the provisions of Article 20 are irreconcilable with the proposition that, under the contract, insurance secured by either Teer or the City covered the cost of repairs.

And we likewise do not believe that plaintiffs are precluded from maintaining these actions because of certain waivers or releases contained in the prime contract. To hold otherwise would, in effect, eliminate Article 20 from the agreements. As plaintiffs point out, the waiver provisions of the general contract can be reconciled with the terms of the subcontracts by recognizing the intent to distinguish between a vertical waiver of rights as opposed to a horizontal waiver.

The prime contract provides that the City and Teer waive all rights *inter se* for damages to the extent covered by insurance and that similar waivers must be required of the subcontractors. The subcontracts provided for such waiver. But the several contract provisions for waiver run only vertically between owner, general contractor and subcontractor and no provision of any of the contracts indicates any intention on the part of the contracting parties to require waivers horizontally among subcontractors not in privity with one another. As a matter of fact, Article 20 compels a contrary conclusion. Thus, we hold that the record fails to demonstrate that plaintiffs waived or released any of their rights of recovery against the defendant for these losses.

The third question in this case is whether the trial court erred in certain evidentiary rulings on the issue of damages. Central to

this controversy is whether various corporate records are admissible to prove the value of materials used and labor performed during repair of the damaged work. Defendant claims that these exhibits were not admissible under the modern Shopbook Rule or the business entry exception to the hearsay rule.

Exhibit 16, offered by Coley & Petersen, was a copy of a five-page typewritten document on Coley & Petersen stationery addressed to the defendant bearing dates in June and July of 1971 and prepared in the ordinary course of business. Listed on the unsigned pages were the labor charges for the employees of Coley & Petersen who worked to repair the damage during a five-week period commencing June 4, 1971. Each page showed a total weekly sum, labelled "Invoiced Amount", which consisted of the labor charge plus percentages for insurance and taxes, overhead and profit. This exhibit was offered through the deposition testimony of Nathan A. Cole, Office Manager in the Roanoke office of the plaintiff during the construction of the Civic Center, and through the in-court testimony of Christian C. Petersen, president of Coley & Petersen.

The testimony showed that pursuant to the Article 20 provision which specified that the wrongdoer "be billed on a weekly basis", Cole, who was in "complete charge" of the project for the plaintiff, prepared in longhand each weekly invoice which was then typed by a secretary and mailed to defendant. Cole's information was taken from the plaintiff's weekly payroll, which had been authenticated as to accuracy by an affidavit mandated by "Government" regulations. During the course of the repairs, this plaintiff assigned employees to work only on the damage, and daily "time sheets" showing the number of hours devoted to repair work by each such employee were prepared by one Richardson, plaintiff's on-site foreman in charge of the repair work. The time sheets were then sent to plaintiff's principal office in Norfolk where the payroll was prepared in the regular course of business. The payroll was then returned to Roanoke with the weekly paychecks for the employees. The testimony showed that at the time of trial the daily time sheets and the payroll records were not "in existence". At the deposition taken five days before the trial, Cole did not know Richardson's whereabouts.

Exhibits 9 and 10 were offered by Clear-Bullock through its president B. B. Clear, who testified that these corporate documents were kept under his supervision in the normal course of business. These exhibits, made up of 44 pages, were in three parts: copies of

6 separate invoices bearing dates from May through October of 1971 showing, in the main, the direct cost of repairing or replacing the electrical equipment; 19 original payroll sheets bearing dates during the same period showing in black ink the total daily hours worked by each individual employee of this plaintiff on the project and showing in red ink the daily number of those hours devoted by the individual to repair work; and 19 copies of payroll sheets for the same days and weeks represented by the original sheets but carrying a computation of the total amount due for the hours worked on repair.

As to the equipment invoices, the testimony showed that the replacement materials were all furnished from Clear-Bullock's warehouse in Martinsville; none was purchased from any independent supplier. The plaintiff, described as a "very small company", was required to store on its premises a large inventory due to plaintiff's distance from other electrical equipment supply houses. When a piece of damaged equipment was identified on the job site, the specific replacement item was taken from plaintiff's warehouse by a supervisor who would write a description of the item on "just notebook paper." The supervisor's notes were then handed to a typist who transferred the information to the invoices, which were addressed to Teer "and/or" defendant. The handwritten notes were destroyed when the particular invoice was typed.

As to the payroll sheets, one Brown, the plaintiff's on-site superintendent, kept the time daily and wrote the black and red figures on the payroll sheets. Clear testified that thereafter, in accordance with company routine, "we excerpted" from the original work sheets of the superintendent the figures in red and prepared the payroll for repair damage with computations of the amount due, including overtime, for this aspect of Clear-Bullock's work. Brown was deceased at the time of trial.

Defendant states that Exhibit 16 is comprised of mere "weekly labor and wage summaries" which were not copies of payroll and were "no more than a declaration of the names of the men and their time and wages." Defendant contends that neither Petersen nor Cole was competent to testify that the listed employees had actually performed the work. Defendant notes that Richardson did not appear as a witness and that "none of the underlying documentation" was offered to support this exhibit. Defendant comments that "[a]ll that was offered was . . . what some unknown person said that foreman Richardson might have said had he testified."

Defendant argues that Exhibits 9 and 10 evidencing Clear-Bullock's labor claim are "affected by the same vice" because superintendent Brown was unavailable as a witness. Defendant says that "the entries were no more than the declarations of a dead man, an allocation of repair labor written in the hand of the decedent on the original time sheets."*

Defendant's attack on that portion of Exhibit 9 showing Clear-Bullock's equipment claim is merely an observation that no one should believe that a modern business would employ such haphazard accounting procedures for warehouse inventory. Defendant equates the plaintiff's system with "that of an eighteenth century Virginia smokehouse" and asks rhetorically "[w]ho could believe" plaintiff's evidence relating to this element of proof. This branch of defendant's argument merely contradicts positive testimony of plaintiff's witnesses and otherwise attacks the weight of the evidence, thus raising issues of credibility only which already have been resolved by the jury. Even so, it will become clear that these records were admissible under the principles which we shall now discuss as we address the labor claim aspects of Exhibits 9, 10 and 16.

Under the modern Shopbook Rule, adopted in Virginia, verified regular entries may be admitted into evidence without requiring proof from the original observers or record keepers, *Neeley* v. *Johnson*, 215 Va. 565, 571, 211 S.E.2d 100, 106 (1975); *duPont Co.* v. *Universal Moulded Products Corp.*, 191 Va. 525, 567-68, 62 S.E.2d 233, 252 (1950). *Generally*, this exception has been limited to facts or events within the personal knowledge of the recorder to which he could testify if called as a witness. *Boone* v. *Commonwealth*, 213 Va. 695, 697, 194 S.E.2d 689, 690 (1973). But this principle does not necessarily exclude all entries made by persons not having personal knowledge of the facts entered. 5 *Wigmore on Evidence* § 1530, at 449 (Chadbourn rev. 1974). In many cases, and this is such a case, practical necessity requires the admission of written factual evidence based on considerations other than the personal knowledge of the recorder, provided there is a circumstantial guarantee of trustworthiness. *French* v. *Virginian Ry.*, 121 Va. 383,

---

* Defendant also argues that the computation of overtime was not based on Brown's allocations because he made none. Thus, defendant says, either Clear "or some other incompetent witness" improperly allocated overtime labor to repair work. This specific objection was not made at trial so we will not notice it on appeal. Rule 5:21.

387-88, 93 S.E. 585, 586 (1917); Wigmore at 449-52. Wigmore, with emphasis, states the rule followed in *French:*

> *where an entry is made by one person in the regular course of business, recording an oral or written report, made to him by other persons in the regular course of business, of a transaction lying in the personal knowledge of the latter persons, there is no objection to receiving that entry under the present exception, verified by the testimony of the former person only, or of a superior who testifies to the regular course of business, provided the practical inconvenience of producing on the stand the numerous other persons thus concerned would in the particular case outweigh the probable utility* of doing so.

Wigmore at 451; *see Allen* v. *Commonwealth,* 122 Va. 834, 842-43, 94 S.E. 783, 785 (1918); C. Friend, *The Law of Evidence in Virginia* § 235, at 429 (1977), *citing McCormick on Evidence* § 312 (2d ed. 1972).

The trustworthiness or reliability of the records is guaranteed by the regularity of their preparation and the fact that the records are relied upon in the transaction of business by the person or entities for which they are kept. *See* Laughlin, *Business Entries and the Like,* 46 Iowa L. Rev. 276, 276-77, 298 (1961). Admission of such evidence is conditioned, therefore, on proof that the document comes from the proper custodian and that it is a record kept in the ordinary course of business made contemporaneously with the event by persons having the duty to keep a true record. *French* v. *Virginian Ry.,* 121 Va. at 388-89, 93 S.E. at 586; Friend at 428-29. The final test in each case is whether the documents sought to be introduced are the type of records which are relied upon by those who prepare them or for whom they are prepared. Laughlin, *supra,* at 299. Such an approach necessarily requires that a determination as to admissibility be made on the facts of each case.

Applying the foregoing principles, we believe the trial court properly admitted Exhibits 9, 10 and 16 in proof of labor charges. In each instance, data were related to the recorders by persons acting within the usual course of business who had personal

knowledge of the facts transmitted. In each instance, the records were relied upon by plaintiffs in the transaction of business generally. The final payroll sheets of Clear-Bullock were prepared based on the personal knowledge of superintendent Brown, who was himself acting in the regular course of business. Transfer of Brown's raw data to the final sheets showing the dollar amounts due for the repair work was a mere exercise in arithmetic applying the hourly labor rate to Brown's information.

Likewise, the notarized payroll of Coley & Petersen, prepared to comply with "Government" regulations, was compiled from data furnished by Richardson who had personal knowledge of the information and who was himself acting in the regular course of business. Cole's compilation of the information contained on the invoices sent to defendant under Article 20 merely excerpted relevant information from the verified payroll. Such schedules properly may be used in lieu of producing a mass of documents and entries to be perused by the court or jury. *duPont Co. v. Universal Moulded Products Corp.*, 191 Va. at 567-68, 62 S.E.2d at 252-53.

Finally, defendant has challenged many other rulings of the trial court as to specific detailed items of damage admitted in evidence. This record discloses that the court below painstakingly considered each of defendant's objections. We have reviewed the trial court's action relating to these issues and find no reversible error in any of the rulings.

For these reasons, the judgment orders appealed from will be

*Affirmed.*