COURT OF APPEALS OF VIRGINIA

Present:   Judges Kelsey, Alston and Decker
Argued at Alexandria, Virginia

EDDIE WAYNE CHEWNING

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 2204-12-4                   JUDGE MARLA GRAFF DECKER
                                                    MARCH 11, 2014

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
Charles S. Sharp, Judge

James J. Ilijevich for appellant.

Susan M. Harris, Assistant Attorney General (Kenneth T. Cuccinelli,
II, Attorney General, on brief), for appellee.


        Eddie Wayne Chewning (the appellant) was tried by a jury and convicted of first-degree

murder and use of a firearm in the commission of a felony, in violation of Code §§ 18.2-32 and

18.2-53.1.  These convictions were based on his participation as an accessory before the fact to

his girlfriend's murder of her mother.  The appellant contends that the trial court erred by:

(1) admitting records of cellular telephone texting[1]; (2) permitting the Commonwealth to read

aloud numerous text messages between the appellant and his girlfriend; and (3) finding that the

evidence was sufficient to prove that the appellant was an accessory before the fact to his

girlfriend's crimes.  We hold that the trial court did not err with regard to any of these actions.

Accordingly, we affirm the convictions.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] "Text messages are written communications from one cell phone to another cell phone."
1 Jay E. Grenig & William C. Gleisner, III, eDiscovery & Digital Evidence § 14:8, at 220 (Supp.
2012-13).

## I. BACKGROUND

On July 5, 2011, seventeen-year-old Ashleigh Dye (Ashleigh) shot and killed her mother, Brenda Dye, in the family's home. At the time of the shooting, the eighteen-year-old appellant had been dating Ashleigh for about four months and was working for Ashleigh's father, Ronald Dye, Sr. (Dye), a brick mason, on a brick restoration job in Alexandria.

On the day of the shooting, the appellant rode to Alexandria as usual with Dye and Dye's son David. At the end of the work day, the appellant rode home with the Dyes but departed quickly. Dye and David went into the residence and found Brenda Dye dead on the bathroom floor. Near her body was a shotgun that belonged to Ashleigh. When sheriff's detectives interviewed Ashleigh, she confessed to shooting her mother and then ransacking the bedrooms to "cover up" the murder before leaving for work.

Detectives also interviewed the appellant. He initially denied knowing anything about the murder. During a second interview, however, the appellant admitted to detectives that Ashleigh had been talking to him about wanting to kill her mother. The detectives obtained a search warrant for the appellant's cell phone records, including his text messages. Based on the content of those text messages, police obtained warrants charging the appellant as an accessory before the fact to the crimes.

In the hour-long interview that followed the appellant's arrest, Detective Michelle Gibbons had "a packet" of the text messages that had been sent between Ashleigh and the appellant on July 5, 2011. The appellant admitted exchanging text messages with Ashleigh on that date. Gibbons confronted the appellant with the specific language of some of the text messages in which he encouraged Ashleigh to kill her mother and referred to their apparent plan. The appellant equivocated about his involvement, claiming first that he told Ashleigh in a telephone call around lunchtime not to kill her mother, but later admitting that "nobody could get

through to [Ashleigh] but [him]" and that he could have stopped her. The testimony of Gibbons and the video recording of the interview show that when Gibbons asked the appellant "if he had any questions [regarding] the text messages [between him and Ashleigh that were contained in the packet] or if he wanted to explain anything, [the appellant] advised [her] that it was all true."

Ashleigh pleaded guilty to murdering her mother, but the appellant denied his guilt as an accessory before the fact. At his trial, the Commonwealth offered evidence of Ashleigh's romantic relationship with the appellant; letters she wrote to him, including a reference to her plan to "KBM" or "kill bitch mom"; and ultimately, evidence that Ashleigh shot and killed her mother in the family residence on July 5, 2011.

The Commonwealth established the cell phone numbers of the appellant and Ashleigh and sought to admit phone records showing the content of the text message exchanges between them before and after the murder on July 5, 2011. To provide a foundation for the admission of these cell phone and text messaging records, the Commonwealth offered the testimony of Andrea Mattia, an employee of Verizon Wireless. The Commonwealth also offered testimony from Detective Gibbons that she used the records identified by Mattia when she interviewed the appellant about the murder and that he admitted the contents were "all true." The appellant objected to admission of the records on hearsay grounds. After hearing argument from the parties, the trial court admitted the records for the truth of their content.

The appellant also objected to the Commonwealth's decision to have the prosecutor and Detective Gibbons read aloud to the jury a portion of the text messages contained in the cell phone records exhibit, arguing that reading them would be prejudicial. Additionally, he noted that the text messages appeared to contain some misspellings, contractions, and abbreviations and argued that it would be error to allow Gibbons or the prosecutor to interpret those items. The trial court overruled the objection, stating no evidence suggested that allowing the exhibit to

be read aloud would "lend[] some super credence or some potential prejudice" to the exhibit and that the appellant could address in closing argument the interpretation of any contractions or abbreviations that he contended were inaccurate.

Detective Gibbons read the portion of the text messages sent from Ashleigh's phone to the appellant's phone, while the prosecutor read the text messages sent from the appellant's phone to Ashleigh's phone. The messages covered the time from before the murder through the period after the appellant returned from work, retrieved his truck from the Dye residence, and drove to meet Ashleigh at her place of employment.

Ashleigh testified at trial that she killed her mother, in part, because the appellant told her to do so. According to Ashleigh, they discussed various ways she could commit the murder. Ashleigh confirmed that she and the appellant texted each other on the day of the murder about their plan. She testified that the appellant's encouragement and advice "enabled" her to kill her mother and that without the appellant's "advice, instigation, or help," she would not have gone through with the plan. Ashleigh said that although she had mentioned wanting to kill her mother to other boyfriends, the appellant was the only one who actually told her to go through with it.

The jury found the appellant guilty of the charged offenses as an accessory before the fact. He was sentenced to thirty-five years with ten years suspended for the murder and three years for the firearm offense. This appeal followed.

II.  ANALYSIS

The appellant challenges the admissibility of the text messages he exchanged with Ashleigh, the reading aloud of a portion of that text message exchange, and the sufficiency of the evidence to prove he was an accessory before the fact to Ashleigh's crimes. We affirm his convictions for the reasons that follow.

- 4 -

A. ADMISSIBILITY OF CELL PHONE RECORDS

The standard of review on appeal is well settled. "[T]he determination of the admissibility of relevant evidence is within the sound discretion of the trial court subject to the test of abuse of that discretion." Beck v. Commonwealth, 253 Va. 373, 384-85, 484 S.E.2d 898, 905 (1997). "'Only when reasonable jurists could not differ can we say an abuse of discretion has occurred.'" Grattan v. Commonwealth, 278 Va. 602, 620, 685 S.E.2d 634, 644 (2009) (quoting Thomas v. Commonwealth, 44 Va. App. 741, 753, 607 S.E.2d 738, 743 (2005)).

"The measure of the burden of proof with respect to factual questions underlying the admissibility of [such] evidence is proof by a preponderance of the evidence." Witt v. Commonwealth, 215 Va. 670, 674, 212 S.E.2d 293, 296 (1975). Once this threshold for proving admissibility has been met, the evidence should be admitted, and any gaps in the evidence are relevant to the trier of fact's assessment of its weight rather than its admissibility. See Kettler & Scott v. Earth Tech. Cos., 248 Va. 450, 459, 449 S.E.2d 782, 786 (1994).

The admissibility of the Verizon Wireless records and text messages was thoroughly addressed at trial. The appellant objected to the admission of the records on hearsay grounds. The Commonwealth contended that two hearsay exceptions supported admission of the documents. The prosecutor asserted that the records themselves were kept in the ordinary course of business and were admissible under the business records hearsay exception. As to the text message content within the records, the Commonwealth argued that the appellant's texts were admissible under the hearsay exception for admissions of a party opponent. The prosecutor further suggested that Ashleigh's texts were not hearsay because they were offered merely to show their effect on the listener rather than to prove the truth of their content. Alternatively, the Commonwealth argued that Ashleigh's statements were adoptive admissions of the appellant because he told Detective Gibbons that the text messages in the packet were all true. The

- 5 -

appellant countered that the Commonwealth failed to prove first-level admissibility under the business records exception as well as second-level admissibility under the party or adoptive admissions exceptions.

The trial court ruled that the underlying records were admissible under the business records exception, finding that Mattia was a custodian of records and that the records were "kept regularly and ha[d] all of the earmarks of trustworthiness." Regarding the admissibility of the text message content, the trial court found that the appellant, when confronted with the text messaging records, "acknowledged the existence of [the exchanges]" and said "it's all true." The court ruled, as a result, that the appellant had made an adoptive admission of the contents of the records. The court "suggest[ed]" that the records were "not . . . hearsay at all" to the extent they were offered to prove "the fact that these exchanges did exist, not that the content of these messages were true." However, the court ultimately ruled that the text messages were admissible without limitation under the business records exception, "not only [for] the timing and placement of the calls and the number of calls, but also for the content of the texts."

The appellant raises the same hearsay issues on appeal. We hold as a matter of law that the Verizon Wireless records themselves qualified for admission as computer-generated records not requiring hearsay analysis or, alternatively, as hearsay admissible under the business records exception. Further, to the extent that the text message content transcribed verbatim within the Verizon Wireless records contained hearsay, that content was admissible under the exceptions for party and adoptive admissions. Consequently, we hold that the trial court did not abuse its discretion in admitting either the records or the text messaging content.

## 1.  Admissibility of the Verizon Wireless Records

Hearsay is "'testimony in court, or written evidence, of a *statement* made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus

resting for its value upon the credibility of the out-of-court *asserter*.'"  Stevenson v. Commonwealth, 218 Va. 462, 465, 237 S.E.2d 779, 781 (1977) (emphases added) (quoting Charles T. McCormick, McCormick's Handbook of the Law of Evidence § 246, at 584 (Edward W. Cleary ed., 2d ed. 1972)); see also Rule 2:801 (defining a "statement" for hearsay purposes as one made by "a person").[2]  "Where a human being has input information into computer data banks as records[,] . . . there is an 'out-of-court asserter' . . . ."  Charles E. Friend & Kent Sinclair, The Law of Evidence in Virginia § 15-8, at 945 (7th ed. 2012); see Frye v. Commonwealth, 231 Va. 370, 386-87, 345 S.E.2d 267, 279-80 (1986) (analyzing records from the Division of Motor Vehicles and National Crime Information Center computer databases, which contained human data input, as hearsay admissible under the business records exception); Godoy v. Commonwealth, 62 Va. App. 113, 121 n.3, 742 S.E.2d 407, 412 n.3 (2013) (distinguishing facts involving "telephone records [that] were solely computer-generated and had no human input" from "computer records that were at least partially generated by employees" posting data by hand).  If evidence is hearsay, "[it] is inadmissible unless it falls within one of the recognized exceptions to the hearsay rule."  Robinson v. Commonwealth, 258 Va. 3, 6, 516 S.E.2d 475, 476 (1999) (citation omitted).

However, when a document contains only "computer generated information" and not "the repetition of prior recorded human input or observation," there is no "out-of-court asserter." Tatum v. Commonwealth, 17 Va. App. 585, 588, 440 S.E.2d 133, 135 (1994).  Therefore, where records are generated entirely by a computer, traditional hearsay principles do not apply because

---

[2] Virginia's Rules of Evidence did not take effect until after the trial of this matter and expressly do not apply.  See 2012 Va. Acts chs. 688, 708; Bailey v. Commonwealth, 62 Va. App. 499, 506 n.2, 749 S.E.2d 544, 547 n.2 (2013).  However, the rules were "adopted to implement established principles under the common law and not to change any established case law rendered prior to the adoption of the Rules."  Rule 2:102.  As a result, "[c]ommon law case authority, whether decided before or after the effective date of the Rules of Evidence, may be argued to the courts and considered in interpreting and applying the Rules of Evidence."  Id.

"'[t]here exists no out-of-court declarant who could be subject to cross-examination. The scientific advances of modern technology have enabled [such] device[s] to make and record the occurrence of electronic events.'" Godoy, 62 Va. App. at 121, 742 S.E.2d at 411 (first alteration in original) (quoting Penny v. Commonwealth, 6 Va. App. 494, 498, 370 S.E.2d 314, 317 (1988)). Based on these differences, records of a business that are wholly computer generated "'are more appropriately analyzed as a scientific test'" for purposes of determining admissibility. Tatum, 17 Va. App. at 588, 440 S.E.2d at 135 (quoting Penny, 6 Va. App. at 498, 370 S.E.2d at 316).

Computer-generated documents, like all writings, must be authenticated to be admissible. See, e.g., Proctor v. Commonwealth, 14 Va. App. 937, 938-39, 419 S.E.2d 867, 868 (1992).

> [T]he requirement of authentication . . . is the providing of an evidentiary basis sufficient for the trier of fact to conclude that the writing came from the source claimed. . . .[3]
>
> . . . . The amount of evidence sufficient to establish authenticity will vary according to the type of writing, and the circumstances attending its admission, but generally proof of any circumstances which will support a finding that the writing is genuine will suffice.

Walters v. Littleton, 223 Va. 446, 451, 290 S.E.2d 839, 842 (1982) (footnote added). Regarding computer-generated records, we have previously admitted such records based on evidence that

---

[3] The appellant's assignment of error refers to "authenticat[ion]" under "the hearsay exception for business records." Although issues of authentication and hearsay sometimes overlap in our appellate case law, authentication is technically not a component of hearsay analysis. Walters v. Littleton, 223 Va. 446, 451, 290 S.E.2d 839, 842 (1982). Compare Rules 2:801 to :804 (hearsay rule and exceptions), with Rules 2:901 to :903 (authentication and self-authentication rules). But see Code § 19.2-70.3 (indicating that the written records of a provider of "electronic communication service" disclosed pursuant to this section may be admitted into evidence under the "business records exception to the hearsay rule" when "authenticated" by an "affidavit from the custodian" as set out in the statute). A proper foundation for the admission of any documentary evidence includes authentication. Walters, 223 Va. at 451, 290 S.E.2d at 842. However, as discussed *supra* in the text, not all documents contain hearsay.

the records were computer generated and the electronic device that produced the records was reliable. See Godoy, 62 Va. App. at 121-22, 742 S.E.2d at 411-12; cf. Midkiff v. Commonwealth, 280 Va. 216, 218-20, 694 S.E.2d 576, 577-78 (2010) (upholding the admission of a "bit for bit copy" of a digital image from a computer hard drive over a best evidence objection where an expert in computer forensic science testified that "[e]ach [such] copy . . . is considered forensically to be an original," thereby establishing the reliability of the digital copy). See generally Friend & Sinclair, supra, § 17-1, at 1167 (suggesting that "[a]uthentication of electronic files may require a foundation explaining the manner in which the digital information is kept[] and how it was retrieved or printed to create the exhibit tendered to the court"); Boyd-Graves Conf., Va. Bar Ass'n, A Guide to Evidence in Virginia § 901 cmt., at 126 (Va. Law Found. 2012 ed.) (opining that "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result is sufficient to satisfy [the authentication] requirement" of Rule 2:901).

In this case, the prosecutor proceeded under a theory that the Verizon Wireless records were hearsay and offered them into evidence under the business records exception. We conclude, however, that the evidence establishes as a matter of law that the Verizon Wireless records were admissible as computer-generated, non-hearsay documents. Cf. Blackman v. Commonwealth, 45 Va. App. 633, 642, 613 S.E.2d 460, 465 (2005) (recognizing that an appellate court may affirm a ruling on a ground not relied upon by the trial court if additional findings of fact are not required), cited with approval in Perry v. Commonwealth, 280 Va. 572, 579-80, 701 S.E.2d 431, 436 (2010). The trial court, in admitting the records, clearly found that the testimony of Andrea Mattia, the company's records custodian, was credible. See Witt, 215 Va. at 674, 212 S.E.2d at 297. Mattia testified about the source and reliability of the records, as

required to authenticate them for admission as computer-generated records. See Godoy, 62 Va. App. at 121-22, 742 S.E.2d at 411-12.

As to the source of the records, Mattia testified that if a customer's account package includes text messaging, the company "keeps track of [the person's] text messages . . . in the normal course of business." She testified further that "*[a]ll of the information* [in the text messaging records comprising Commonwealth's Exhibit 28] is what was captured for what was being sent and what was being retrieved for [the appellant's phone] number." (Emphasis added). The information "captured" included the sending and receiving phone numbers, "[each] message the sender texted," and the date and time each text message was sent. Mattia explained that all data is "captured on the server" and that this data, if not requested to be preserved, is ultimately destroyed "because the servers are not able to hold all of that forever" and "[i]t's just laid over[,] [o]ther stuff comes on top of it." Finally, Mattia confirmed that the company's legal department was "able to retrieve those text messages belonging to [the appellant's phone number] and reduce th[em] to writing." This testimony establishes that it was Verizon Wireless's computers that "captured" all the data contained in the exhibit, from the phone numbers sending and receiving the text messages and the times the messages were sent to the verbatim content of the messages themselves. Consequently, neither Verizon Wireless nor any of its employees was a declarant for purpose of the records, which were wholly computer generated.

Mattia's testimony also establishes that the records were reliable, and the trial court expressly found them "trustworth[y]." As recognized in Godoy, a court may consider a broad array of factors in determining reliability for purposes of admitting wholly computer-generated records. 62 Va. App. at 122, 742 S.E.2d at 412. Factors sufficient to establish the reliability of computer-generated records include "regular business use and reliance." Paul R. Rice, Electronic Evidence 472-73 (2d ed. 2008); see Godoy, 62 Va. App. at 122, 742 S.E.2d at 412;

see also Tatum, 17 Va. App. at 588-90, 440 S.E.2d at 135-36 (holding the reliability of a caller ID device was established by the testimony of the device's owner that it had functioned properly in the past). Thus, in analyzing the admissibility of computer-generated records, reliability principles applicable under the business records hearsay exception, although not controlling, are instructive, and we consider the appellant's objections in light of these principles.

The appellant contends that the trial court erred in holding that the text message records were reliable because Mattia did not compile the records herself and could not explain certain codes contained in the document. He further argues that because, absent a court order requiring their preservation, the records would have been "written over by other data in about three to five days," Mattia failed to establish that the records of the text message content "were prepared in the ordinary course of business" and "meant for billing." Contrary to these arguments, we hold that the evidence supports a finding that Verizon Wireless's records were reliable and, thus, admissible as computer-generated records.

Mattia testified that the records of the text message content were prepared by the company, in the ordinary course of business for purposes of billing, for all customers whose accounts included text messaging services. She explained that although the Verizon Wireless legal team pulled the records in response to the court order requiring their preservation, she was a custodian of records for the company. Her responsibilities included obtaining a copy of those records from the legal team in order to testify about them in court. She confirmed that she checked the records to be sure they covered the phone number and time period for which the records had been requested. The trial court expressly accepted Mattia's testimony that she was a custodian of the records and that they were "kept routinely and for the purposes of the business . . . for some period of time." The court found it insignificant, for purposes of admitting the records, that "[Mattia] was uncertain about the meaning of some non-entries." It ultimately

- 11 -

concluded that the evidence was sufficient "to show that [the records] . . . ha[d] all of the earmarks of trustworthiness." This testimony met the evidentiary threshold required to admit computer-generated records. See Godoy, 62 Va. App. at 122, 742 S.E.2d at 412 (upholding admission based on the testimony of T-Mobile's records custodian that the records were kept and relied upon in the normal course of business and were accurate); see also State v. Taylor, 632 S.E.2d 218, 230-31 (N.C. Ct. App. 2006) (holding "printouts or transcripts of . . . text messages" were "properly authenticated" by testimony from two Nextel employees about "how Nextel sent and received text messages and how the[] particular text messages were stored and retrieved"); cf. Lee v. Commonwealth, 28 Va. App. 571, 576, 507 S.E.2d 629, 632 (1998) (holding that the testimony of a company's fraud investigator that he "had knowledge of how [the company's] records were compiled and maintained[] and . . . had access to those records as an integral part of his responsibilities . . . for his employer" was sufficient to support admissibility under the business records exception); Rule 2:803(6) (requiring "testimony of the custodian *or other qualified witness*" to verify origin under the business records exception (emphasis added)).

Additionally, the fact that Mattia equivocated on cross-examination regarding how the records were used did not render them inadmissible based on reliability concerns. Mattia testified that the records were routinely relied upon for business purposes. The Commonwealth was not required to prove a specific business purpose. See Godoy, 62 Va. App. at 122, 742 S.E.2d at 412 (noting that the records were relied upon in the performance of unspecified "work-related functions"); Swanson v. Commonwealth, 8 Va. App. 376, 378-79, 382 S.E.2d 258, 259 (1989) (recognizing that the credibility of a witness who makes inconsistent statements is for the trier of fact to determine). Further, Mattia's inability to explain two line items of data containing a jumble of letters and numbers where text message content was expected to appear did not render the records inadmissible under the broad reliability principles of Godoy. Cf.

- 12 -

Kettler & Scott, 248 Va. at 459, 449 S.E.2d at 786 (in applying the business records hearsay exception, holding that the manual performance by employees of data sorting previously done by a computer, thereby reducing reliability, went to the weight to be given the evidence rather than to its admissibility).

Finally, the fact that the evidence established that the records of the text message content would have been kept only three to five days absent a preservation order did not render them unreliable. The record supports a finding that the company used text messaging data for business purposes before the records were routinely automatically "laid over" with new records. As long as the reliability of the records is established, as it was here, the proponent need not additionally prove that the records would have been retained indefinitely or for some finite period longer than three to five days. Cf. State v. Blake, 974 N.E.2d 730, 739-41 (Ohio Ct. App. 2012) (affirming the admission of text messages under the state business records hearsay exception based on testimony that the company retained those records in the ordinary course of business for about seven days).

Thus, the evidence was sufficient to authenticate the Verizon Wireless records as computer-generated records, and the only hearsay analysis required involves the content of certain text messages themselves.

Assuming, however, that the evidence did not establish that the Verizon Wireless records were admissible as computer-generated records, the appellant's challenge still fails because, absent such proof, their admission under the business records exception, as considered by the trial court, was also proper. Cf. Code § 19.2-70.3(F) (indicating, *inter alia*, that the records of a "provider of electronic communication service," not including "the contents of electronic communications," are admissible in evidence *under the business records exception* upon presentation of "an affidavit from the custodian of those . . . records . . . certifying that they are

- 13 -

true and complete and that they are prepared in the regular course of business"). The business records exception permits "'the admission into evidence of verified regular entries without requiring proof from the original observers or record keepers.'" McDowell v. Commonwealth, 273 Va. 431, 434, 641 S.E.2d 507, 509 (2007) (quoting Neeley v. Johnson, 215 Va. 565, 571, 211 S.E.2d 100, 106 (1975)); see Kettler & Scott, 248 Va. at 457-58, 449 S.E.2d at 785-86 (holding that courts apply this exception to determine the admissibility of computer records containing employee data entry).

> Business records are admitted as an exception to the hearsay rule because they have a guarantee of trustworthiness and reliability. The business must keep the records in the normal course of its business and make them contemporaneously with the event that generates them. The people who prepare them [or] for whom they are prepared must rely upon the records in the transaction of the business.

Lee, 28 Va. App. at 576, 507 S.E.2d at 632.

The same evidence that established reliability under the test for computer-generated records also supports the trial court's finding of reliability under the business records exception to the rule against hearsay. Settled principles make clear that a witness need not be the sole official custodian of business records in order to provide foundational testimony about them for purposes of the hearsay exception as long as that witness "ha[s] knowledge of how [the company's] records [are] compiled and maintained[] and . . . ha[s] access to those records as an integral part of his responsibilities . . . for his employer." Id.; see also Rule 2:803(6) ("testimony of the custodian *or other qualified witness*" (emphasis added)).

As previously noted, Mattia testified that the records of the text messages were prepared by the company, in the ordinary course of business, for all customers whose accounts included text messaging services. She also stated she was a custodian of the records and that her duties included reviewing and testifying about them. The admissibility of the records was not impacted

- 14 -

simply because Mattia, on cross-examination, expressed some uncertainty regarding precisely how the company used the records in the course of its business.  See Swanson, 8 Va. App. at 378-79, 382 S.E.2d at 259.  Further, the records were not rendered inadmissible by the fact that Mattia was unable to explain two jumbled line items within the document of over 250 text messages.  See Kettler & Scott, 248 Va. at 459, 449 S.E.2d at 786.  Finally, admissibility under the business records exception does not require that the records would have been retained for longer than three to five days.  See Blake, 974 N.E.2d at 739-41.  Consequently, Mattia's testimony met the evidentiary threshold required to admit the Verizon Wireless records under the business records exception.

Based on the evidence in this case, we conclude that a reasonable jurist could hold that the Verizon Wireless records were admissible and, therefore, the trial court did not abuse its discretion in admitting the records.

## 2.  Admissibility of Text Message Content

The appellant also contends that the Verizon Wireless records were inadmissible because his and Ashleigh's statements contained in the records were hearsay and lacked indicia of trustworthiness.  Contrary to the appellant's argument, the vast majority of the text messages were simply not hearsay in the appellant's trial for being an accessory before the fact; consequently, they were admissible once the underlying records were held admissible.  Further, assuming that a small number of the text messages in the Verizon Wireless records were hearsay, they were admissible against the appellant under an established exception to the rule against hearsay, as either admissions by a party opponent or adoptive admissions.[4]

---

[4] The prosecutor argued that some of the text messages were admissible as non-hearsay for purposes other than proving the truth of their content.  He averred, in the alternative, that any hearsay in the texts was admissible under the exceptions to the hearsay rule.  The trial court expressly admitted all the texts for their truth.  Consequently, as to the few texts that we assume were hearsay when admitted for their truth, we analyze them under hearsay principles.

### a. Admissibility of Certain of the Appellant's Text Messages

"It is well established . . . that an out-of-court statement by a criminal defendant, if relevant, is admissible as a party admission, under an exception to the rule against hearsay." Bloom v. Commonwealth, 262 Va. 814, 820, 554 S.E.2d 84, 87 (2001), aff'g 34 Va. App. 364, 542 S.E.2d 18 (2001); see also State v. Espiritu, 176 P.3d 885, 890-91 (Haw. 2008) (holding "actual text messages" from the defendant were admissible under the party admissions exception). The appellant contends on brief that "[w]ithout an express acknowledgement of [each of] the statements by their alleged maker, they could not be offered as statements of a party opponent." We disagree.

This Court has previously held that Internet conversations conducted through instant messaging are in some respects "analogous to telephone conversations." Bloom, 34 Va. App. at 369-70, 542 S.E.2d at 20. Well-established principles provide that "[c]onversations overheard on a telephone are admissible if direct or circumstantial evidence establishes the identity of the parties to the conversation. [Similarly,] [m]essages received over the [I]nternet are admissible against the sender if the evidence establishes the identity of the sender." Id. (citation omitted); cf. Bloom, 262 Va. at 822 n.2, 554 S.E.2d at 88 n.2 (affirming but refraining from adopting this Court's holding that conversations over the Internet are analogous to telephone conversations because Internet communications do not provide an "opportunity for voice recognition"). These same principles apply to text messages sent from a cellular telephone. Although the type of evidence used to prove the identity of a telephone caller may be different from that used to prove the identity of one who sends a text or Internet message, the governing legal standard is the same—proof by a preponderance of direct or circumstantial evidence, see id. at 820-21, 554 S.E.2d at 87.

Under the applicable preponderance of the evidence standard, the record supports a finding that the appellant made the statements contained in the texts sent from his phone on July 5, 2011. The appellant admitted to Detective Gibbons that the phone from which the texts were sent was his phone. The appellant also admitted exchanging text messages with Ashleigh on July 5. When Detective Gibbons showed him the packet of text message records, after having discussed specific content within, and asked if there was anything in the packet that he "want[ed] to explain," the appellant ultimately admitted, "You have it right there in front of you," "It's just all true," and "I guess every single thing in there is true." This evidence met the foundational requirement of proving that the appellant was the person who sent the text messages from his phone to Ashleigh's phone on July 5, 2011. Thus, the appellant's texts were admissible under the party admissions exception to the rule against hearsay.

#### b. Admissibility of Certain of Ashleigh's Text Messages

Assuming that some of Ashleigh's text messages were admitted for their truth and, thus, also constituted hearsay, those messages were admissible as adoptive admissions. Just as the statements of a party opponent are admissible as an exception to the hearsay rule, statements made by others and adopted by that party as his own are also admissible as a hearsay exception. Lynch v. Commonwealth, 272 Va. 204, 208-09, 630 S.E.2d 482, 484-85 (2006), aff'g 46 Va. App. 342, 617 S.E.2d 399 (2005). The appellant contends that "[w]ithout an express acknowledgement of [each of] the statements by their alleged maker, they could not be offered as . . . an adoptive admission." Once again, we hold that the applicable legal principles applied to the facts in evidence, viewed in the light most favorable to the Commonwealth, support a contrary conclusion.

A party may manifest his adoption of the admissions of another either impliedly, through his silence or conduct, or expressly, through "'oral or written statements of the party.'" Lynch,

46 Va. App. at 350-51, 617 S.E.2d at 403 (quoting Charles E. Friend, The Law of Evidence in Virginia § 18-49(c) (6th ed. 2003)). Consequently, the trial court was required to determine only "whether, in light of the [overt] verbal or non-verbal response, 'there [were] sufficient foundational facts from which the jury could infer that [the appellant] heard, understood, and acquiesced in the statement[s].'" Id. at 352, 617 S.E.2d at 404 (quoting United States v. Robinson, 275 F.3d 371, 383 (4th Cir. 2001)) (internal quotation marks omitted).

In the same way that the appellant admitted ownership of his texts in the packet of records, he also adopted Ashleigh's texts, telling Detective Gibbons, "It's just all true." This evidence supports the trial court's explicit finding that the appellant adopted Ashleigh's text messages as his own, making them admissible to prove the truth of the matters asserted in those texts.

Thus, we hold that the trial court did not err in admitting the Verizon Wireless records. Additionally, to the extent that some of the text message content within those records was hearsay, those hearsay statements were admissible under the exception for either admissions by a party opponent or adoptive admissions.

## B. READING ALOUD THE EXCHANGE OF CERTAIN TEXTS

The appellant contends that the trial court erred in permitting the prosecutor to read aloud texts attributed to the appellant while Detective Gibbons read aloud texts attributed to Ashleigh. The appellant claims that allowing certain text messages to be presented in this way amounted to "a dramatic reading" creating "an absolute risk . . . [of] plac[ing] undue weight on the texts which could confuse or enflame the jury." He also suggests that allowing the readers to interpret certain abbreviations and contractions within the text messages added to the risk of prejudice.

Under settled principles, the trial court "is allowed very considerable latitude with respect to the substance and form of the parties' presentation of the case." Curtis v. Commonwealth, 3

Va. App. 636, 642, 352 S.E.2d 536, 540 (1987). We applied this principle in Pryor v. Commonwealth, 48 Va. App. 1, 628 S.E.2d 47 (2006), when we rejected a defendant's claim that was similar to the one raised here. In Pryor, the Commonwealth sought to have read aloud to the jury the preliminary hearing testimony of a key witness who was unavailable at the time of trial. Id. at 8, 628 S.E.2d at 50. The defendant contended that the reading constituted "an impermissible 'reenactment.'" Id. at 10 n.6, 628 S.E.2d at 51 n.6. In rejecting the defendant's argument, we relied on the principle that the "'manner of the introduction of evidence' involves a core aspect of the trial court's discretion" and that the court's ruling on such a matter will not be reversed on appeal absent an abuse of this discretion resulting in prejudice to the defendant's case. Id. (quoting Cheng v. Commonwealth, 240 Va. 26, 40, 393 S.E.2d 599, 606 (1990)) (internal quotation marks omitted). The same principles apply here.

In this case, the exhibit containing the text messages had already been admitted into evidence when the issue arose about reading certain portions aloud. Each text message record contained, in addition to the text content, extensive extraneous information, much of which was neither understandable to the jury nor relevant to the case. The exhibit was ninety pages long. Each page contained only three or four texts. In light of these facts, and applying the correct legal standard, we hold that the trial court did not abuse its discretion in concluding that allowing the prosecutor to read some of the appellant's texts and the detective to read some of Ashleigh's texts was a useful tool in the pursuit of truth rather than an overemphasis creating additional prejudice to the appellant beyond the permissible prejudice that flowed from the evidence itself. See Muhammad v. Commonwealth, 269 Va. 451, 487, 518-19, 619 S.E.2d 16, 36, 55 (2005) (upholding a ruling admitting a video showing a re-creation of shootings that occurred from the trunk of a car); Mackall v. Commonwealth, 236 Va. 240, 253-54, 372 S.E.2d 759, 768 (1988)

(upholding a ruling allowing the medical examiner to "insert[] . . . a knitting needle into a styrofoam . . . head" in conjunction with testimony about the trajectory of a bullet).

Additionally, other than the appellant's claim that permitting the texts to be read aloud would amount to "a dramatic reading," the record is silent as to *the manner* in which the prosecutor and detective actually read the text messages. See Smith v. Commonwealth, 16 Va. App. 630, 635, 432 S.E.2d 2, 6 (1993) (holding that an appellant bears the burden of submitting a record that enables the court to determine whether there has been an abuse of trial court discretion). On this record, we are unable to discern any prejudice beyond that resulting from the content of the statements themselves, already determined to be admissible for their truth in Part II(A). Thus, we hold that the trial court did not err in permitting the reading.

Further, we conclude that allowing the prosecutor and detective some leeway to interpret various everyday abbreviations and misspellings in the texts they read aloud was not an abuse of the trial court's discretion. See Law v. Commonwealth, 39 Va. App. 154, 159-60, 571 S.E.2d 893, 896 (2002). In many instances following the appellant's objection on this ground, which came early in the course of the reading, the readers spelled aloud the words that were abbreviated or misspelled so that the jurors could draw their own inferences. Additionally, in overruling the objection, the trial court made clear that the appellant was free to argue to the jury that the reader had misinterpreted one or more abbreviations or misspellings. The appellant, however, did not challenge any of these interpretations in his closing argument, nor on appeal does he point to any particular errors as unduly prejudicial. Once again, therefore, we find no prejudice beyond that resulting from the content of the statements themselves, and we hold that the trial court did not abuse its discretion by permitting the limited interpretation of abbreviations and misspellings provided by the readers.

## C.  SUFFICIENCY OF THE EVIDENCE:  ACCESSORY BEFORE THE FACT

The appellant was convicted as an accessory before the fact to first-degree murder and use of a firearm in the commission of a felony.  Code § 18.2-18 provides, in relevant part, that "every accessory before the fact [to a felony] may be indicted, tried, convicted and punished in all respects as if a principal in the first degree[, the actual perpetrator]."  In order for a defendant to be convicted as an accessory before the fact, the Commonwealth must prove that:  the crime was committed by the principal; the defendant was absent during the commission; and, prior to the crime's commission, the defendant "encourage[d], incite[d] or aid[ed]" the principal's commission of the crime.  McGhee v. Commonwealth, 221 Va. 422, 425-27, 270 S.E.2d 729, 731-32 (1980).

The appellant challenges the sufficiency of the evidence only as it relates to his involvement in the murder.[5]  He contends that the Commonwealth was required to prove that he provided encouragement amounting to "direct action in the planning or execution of [the] murder" and that evidence proving he "provid[ed] [only] moral support" was insufficient to support a conviction.  He avers that the only evidence that he participated in planning the murder came from Ashleigh's trial testimony, which he suggests was not credible.  We reject the appellant's arguments and hold that the evidence was sufficient to support his convictions.

"In accordance with familiar principles of appellate review, 'we consider th[e] facts in the light most favorable to the Commonwealth,' the party that prevailed below."  Schwartz v. Commonwealth, 45 Va. App. 407, 415, 611 S.E.2d 631, 635 (2005) (quoting Rose v. Commonwealth, 265 Va. 430, 432, 578 S.E.2d 758, 759 (2003)).  "Moreover, 'the credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has

---

[5] It is undisputed that Ashleigh, who confessed and pleaded guilty, committed the crimes. It is also undisputed that the appellant was not present when the crimes were committed.

the opportunity to see and hear that evidence as it is presented.'"  Wilkerson v. Commonwealth, 33 Va. App. 808, 822, 537 S.E.2d 27, 34 (2000) (quoting Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995)); see Swanson, 8 Va. App. at 378-79, 382 S.E.2d at 259 ("It is firmly imbedded in the law of Virginia that the credibility of a witness who makes inconsistent statements . . . is a question for the jury . . . [and that] [i]f the trier of the facts sees fit to base the verdict upon that testimony there can be no relief in the appellate court.").  Further, "[o]n appellate review, we do not substitute our judgment for that of the fact finder."  Hamilton v. Commonwealth, 279 Va. 94, 105, 688 S.E.2d 168, 175 (2010).  Finally, we will "'affirm the judgment unless it appears from the evidence [viewed in light of these standards] that the judgment is plainly wrong or without evidence to support it.'"  Wilkerson, 33 Va. App. at 822, 537 S.E.2d at 34 (quoting Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975)).

To sustain the conviction of an accessory before the fact,

> [t]he evidence must . . . establish that the accessory . . . shared the criminal intent of the principal.  See, e.g., Rasnake v. Commonwealth, 135 Va. 677, 707-10, 115 S.E. 543, 553-54 (1923) (applying the same requirement to principals in the second degree).  To be guilty as an accessory before the fact, the accused must either know or have reason to know of the principal's criminal intention and *must intend to encourage, incite, or aid the principal's commission of the crime*.

McGhee, 221 Va. at 427, 270 S.E.2d at 732 (emphasis added).  Proof of an "overt act that is advantageous to the principal's criminal plan" is not necessarily sufficient.  McMorris v. Commonwealth, 276 Va. 500, 505, 666 S.E.2d 348, 351 (2008).  The evidence as a whole must prove that "the defendant . . . also share[d] . . . the principal's criminal intent."  Id.

"An instigator of a crime is an accessory before the fact even though he or she did not participate in the planning of the crime or even though unaware of the precise time or place of the crime's commission or of the precise method employed by the principal."  McGhee, 221 Va.

at 427, 270 S.E.2d at 732. Further, "[t]hat a principal fails to follow a procedure outlined by an accused in no way lessens the accused's culpability as an accessory before the fact." Id. at 427 n.4, 270 S.E.2d at 732 n.4.

"Whether an accused knew . . . of the principal's criminal intention, whether an accused encouraged the principal's commission of the crime, and whether the encouragement induced the principal's commission of the crime are questions of fact to be resolved by the fact finder . . . ."[6] Id. at 427, 270 S.E.2d at 733.

Here, the evidence, viewed in the light most favorable to the Commonwealth, supports the jury's verdict that the appellant was an accessory before the fact to the murder and firearm offenses.[7] The evidence proved that the appellant, acting with the requisite intent, encouraged and incited Ashleigh to commit the murder, helped her plan it, and thereby induced her to act.

The appellant told Ashleigh's brother Brandon in the weeks before the murder that he sometimes wished Brenda Dye was dead because "it would make life a whole lot easier." The appellant described Ashleigh's mother to police as "a[n] arguer" who "always wanted to start a fight over something stupid," and he admitted having had multiple altercations with her. Ashleigh testified that she had become pregnant while dating the appellant and that when her mother found out, she hit Ashleigh in the stomach, causing her to have a miscarriage. Ashleigh

---

[6] The Supreme Court of Virginia stated in McGhee that "[t]he amount of incitement or encouragement to commit the crime [provided by the accessory] is irrelevant if the encouragement in fact induces the principal to commit the offense." 221 Va. at 427, 270 S.E.2d at 732-33 (citing Perkins, Parties to Crimes, 89 U. Pa. L. Rev. 581, 600 (1941)). We need not consider precisely where the sufficiency threshold lies because, as discussed infra, the record contains abundant evidence of the appellant's encouragement of Ashleigh, supporting his conviction as an accessory before the fact.

[7] Appellant's only challenge to the sufficiency of the evidence to prove his guilt of the firearm offense was that the evidence was insufficient "to support a finding . . . that he committed the predicate offense of homicide as an accessory before the fact." Consequently, we need not separately consider the firearm offense.

- 23 -

further testified that the day before the murder, she and the appellant discussed various ways in which Ashleigh could murder her mother and cover it up.  The appellant complained that her mother was "always pushing [them] around," "yelling and trying to control [Ashleigh's] every move."  Ashleigh said that the appellant told her she had to kill her mother to avenge the death of their unborn child and that he would break up with her if she did not do so.  The evidence of the appellant's encouragement and incitement to act was abundant.

Regarding planning the murder, Ashleigh told the jury that on July 4, 2011, she and the appellant discussed her using a knife to slit her mother's throat.  Ashleigh said the appellant gave her two knives to use, but Ashleigh decided to shoot her mother instead.  The police found several knives under her mattress after the killing.  Ashleigh's testimony alone made apparent the appellant's efforts to aid her in the murder.

The text messages Ashleigh and the appellant exchanged on the day of the murder provide significant corroboration of Ashleigh's testimony about their plan and the appellant's active encouragement of her execution of that plan.  Early that morning, Ashleigh texted the appellant that she was "freaking out" and "trying to make sure there [were] no flaws" in the plan.  The appellant replied, "Don't babe ull be fine."  When Ashleigh texted that she was very nervous and asked, "What if I freeze," the appellant replied, "U can't freeze hunn seriously."  Ashleigh then texted that she was going to "use [a] back up plan," was "trigger happy," and would "follow with knife."  The appellant replied, "Ok hun" and "Dnt freak or freeze."  Ashleigh sought the appellant's advice regarding the use of a firearm and asked which of two different types of ammunition would be louder.  The appellant replied, "Not much diff."  He then admonished Ashleigh to "Stop tlkn about it" and "Do it."  Later, Ashleigh texted the appellant, "I need to know if I shld wait till she fully gets up and shoot her from the back?"  The appellant again replied, "Stop tlkn about the shittt" and "Do it."  When Ashleigh texted that she was "[n]ervous"

- 24 -

and "shaking like hell," the appellant, for the first time during their long exchange, equivocated, texting "Dnt do it" "[d]en." Ashleigh, clearly continuing to rely on the advice and encouragement of the appellant, then asked, "Why not???" She texted further, "Yes or no damnit" and "I need to know." Only at that point did the appellant say, "Your call babe."

Ashleigh testified that shortly thereafter, she and the appellant spoke over the phone, and the text message records show several gaps in the texting. The appellant admitted speaking to Ashleigh on the phone during that period of time. Ashleigh testified that she told the appellant during that call that she was going to kill her mother and that the appellant replied, "Okay." Consistent with this testimony, shortly after the texting gap, the appellant texted Ashleigh to ask what was happening. Ashleigh replied in part, "Shes on the phone ima go down and get set up," and the appellant texted back, "Ok babeee." After a ten-minute gap in text messages, Ashleigh texted the appellant that she was "scared" because "[h]er facr . . . [w]as gone," apparently referring to the impact of the shotgun blast on her mother after Ashleigh had shot her in the head. The appellant reminded Ashleigh about what was apparently a component of their plan that had not been set forth in the text messages, texting, "U gota do wht I told u. . . About the thng," and Ashleigh responded, "I did all I could." After an additional exchange of texts and a photo sent to the appellant by Ashleigh, the appellant texted again, "goto ur house to do wht I asked u to wen we tlkd." Ashleigh texted, "I am not going back," "Not [gonna] happen." The appellant, much like he had done throughout the day, then texted that he loved her, and he added "feel good now."

The two also exchanged text messages before and after the shooting about the need to cover up the murder and their efforts to do so, which further illustrated the appellant's behavior as an accessory before the fact who had clearly been involved in planning the crimes. After the various texts in which Ashleigh described modifications to the plan and the appellant encouraged

her to follow through without freezing, the appellant told Ashleigh not to move his truck and to leave his keys there at her house. After Ashleigh committed the murder, she instructed him to "act normal" when he got back to the Dye residence at the end of the work day but to leave quickly because the body was in the house. They discussed through texts the need for them both to "act sad" after the body was discovered. Ashleigh also texted the appellant to "remeberr red truck with guy in it was at bottom of hill," an apparent reference to an earlier discussion about how they might direct suspicion away from themselves and onto a fabricated third party.

In a continued effort to hide their involvement in the murder, Ashleigh directed the appellant to "delte texts now" and "Delte all texta" prior to his returning to the house at the end of the day. The appellant replied twice that he had done so. Consistent with the plan for a rapid departure from the scene of the crimes, the appellant texted Ashleigh, "I am up front today" and "[I'm] tryna beet david [out of the truck]." He then texted "I jus left" and "I speeeededd," after he quickly departed the residence in his own vehicle to avoid being present when the Dyes discovered the body of Ashleigh's mother. Ronald Dye confirmed that the appellant left quickly, without saying goodbye or "tak[ing] his tools, lunchbox or [anything]," and indicated that this was "strange" behavior which showed "something was wrong."

Perhaps most compelling regarding the appellant's guilt as an accessory before the fact was Ashleigh's express testimony that the appellant's encouragement and advice "enabled" her to kill her mother. Ashleigh admitted that she had thought about killing her mother since she was eleven years old. According to Ashleigh, she had discussed it with previous boyfriends, but only the appellant encouraged her to act on her murderous thoughts. The text messages demonstrate that when the appellant first equivocated, Ashleigh, clearly continuing to rely on his advice, asked, "Do u think I shld[,] yes or no," and "damnit, i need to know." Ashleigh and the appellant then spoke on the phone, after which Ashleigh carried out the modified plan of

- 26 -

murdering her mother using a firearm and ransacking the house to try to make it look like a burglary. Ashleigh testified expressly that without the appellant's "advice, instigation, or help," she would not have killed her mother.[8]

Finally, when the appellant was interviewed by police and confronted with the detailed record of the texts he and Ashleigh had exchanged on July 5, the appellant admitted he had grown weary of "listening to [Ashleigh's mother] bitch every day" and felt the same way Ashleigh did about her mother. He further admitted not only that he "allowed" Ashleigh to commit the murder and could have stopped her but also that he "egged her on[,] . . . encourag[ing] her to do [it] . . . to please [him and] to make [him] happy."

This record demonstrates that the jury had ample evidence before it from which to conclude that the appellant was guilty beyond a reasonable doubt. Thus, its verdict is not plainly wrong or without evidence to support it. The facts in this case, viewed in the light most favorable to the Commonwealth, reflect precisely the sort of criminal involvement that the accessory principles of Code § 18.2-18 are designed to punish. The appellant engaged in a *pattern* of behavior far more egregious than the type of brief *de minimus* involvement that he argues is insufficient to support his convictions. Although McGhee requires proof, in the disjunctive, of intentionally "encourag[ing], incit[ing] or aid[ing]" the principal's commission of the crime, 221 Va. at 427, 270 S.E.2d at 732, the Commonwealth's evidence proved all three. The totality of the evidence, including Ashleigh's testimony and the appellant's own admissions,

---

[8] The appellant contends that Ashleigh, a defense witness, was inherently incredible and, therefore, her testimony could not serve as a basis for his conviction. Settled principles provide, however, that "[t]he fact that a witness makes inconsistent statements . . . does not render [her] testimony . . . unworthy of belief." Swanson, 8 Va. App. at 378, 382 S.E.2d at 259. Our case law clearly holds that the credibility of a witness who makes inconsistent statements is a jury question. See id. at 378-79, 382 S.E.2d at 259. The jury was justified in believing Ashleigh's testimony which was amply supported by other evidence of the appellant's guilt.

was sufficient to support the appellant's convictions as an accessory before the fact to Ashleigh's crimes.

III.

For these reasons, we hold that the trial court did not err in admitting the challenged cell phone records and their text messaging content; allowing the Commonwealth to present a reading of the text message exchange to the jury; or concluding that the evidence was sufficient to support the appellant's convictions as an accessory before the fact to murder and use of a firearm in the commission of a felony.  Consequently, we affirm the convictions.

Affirmed.