456 S.E.2d 163

**Lieu N. FITZHUGH**

v.

**COMMONWEALTH of Virginia.**

**Record No. 0090–94–4.**

Court of Appeals of Virginia,
Alexandria.

April 25, 1995.

Robert J. Hartsoe, Asst. Public Defender (Office of the Public Defender, on brief), for appellant.

Kathleen B. Martin, Asst. Atty. Gen. (James S. Gilmore, III, Atty. Gen., on brief), for appellee.

Present: MOON, C.J., and FITZPATRICK, J., and DUFF, Senior Judge.

MOON, Chief Judge.

From her bench trial conviction of attempted grand larceny, Lieu N. Fitzhugh argues that the trial court erred by admitting into evidence two cash register tapes from the grocery store where the offense occurred and that the evidence was insufficient to sustain her conviction for attempted grand larceny. We hold that the trial judge properly admitted the cash register tapes into evidence under the business records exception to the hearsay rule. As both tapes were properly admitted, the evidence was sufficient to convict Fitzhugh of

attempted grand larceny and, therefore, we affirm the trial court.

On Saturday, October 24, 1992, Fitzhugh was working as a cashier at the Countryside Safeway in Loudoun County. Scott Travers, the assistant manager, became suspicious of Fitzhugh when he saw her in a store aisle putting a $27 rib roast into a man's shopping cart, which also contained a lot of "high dollar items." When Travers returned to the check-out area of the store, he noticed the same man going through Fitzhugh's checkstand.

Travers then told the head teller, Martha Hammond, to observe the cash register activity in Fitzhugh's lane from a monitor in the store's office while he watched Fitzhugh from the manager's office. Hammond saw nothing on the office monitor except the message "waiting for checker to start new order." This indicated that no grocery items were passing across the scanner which registers the item's price on the monitor. Hammond stuck her head out of the office window to personally observe Fitzhugh's checkstand and saw Fitzhugh pulling the grocery items to the side of the scanner on the counter of the checkstand and putting them directly into the grocery bags.

At the same time, Travers saw Fitzhugh scan four or five deli items, the prices of which he saw on her cash register's display window, and then pull the rest of the grocery items across the checkstand so that the scanner's laser beam could not read the bar codes. After the first five deli items, nothing registered on Fitzhugh's register display window. When the man's order was complete, Fitzhugh had filled between eleven and thirteen grocery bags.

Travers immediately stopped the man as he left Fitzhugh's checkstand and asked him for his receipt. The man replied that he could not find it. Travers told him that he did not believe that the grocery items in his cart had been properly charged and called Ms. Hammond from the office to re-scan all of the items in the store's training mode at another register. The man eventually fled the Safeway and was never

apprehended. Travers then asked Fitzhugh to stand to the side of her checkstand while he checked the cash register drawer. Afterwards, Travers notified security and directed Hammond to pull the cash register tape from Fitzhugh's register.

During Fitzhugh's trial, the Commonwealth sought to introduce into evidence two cash register tapes. The first tape was taken from Fitzhugh's register and showed that the order of the man who came through her checkstand consisted of only five deli items for a total of $25.30. The second tape, which came to a total of $426.22, was produced by Hammond when she re-scanned each grocery item taken from the man's shopping cart. During her testimony, Hammond marked a majority of the items on the second tape with an "x" to indicate the prices of items which she personally verified. The second tape also contained five deli items with identical amounts to the five deli items that were on the first tape.

Fitzhugh objected as hearsay to the introduction of the cash register tapes, arguing they did not fall within the business records exception to the hearsay rule nor were they admissible as reliable computer generated information. The tapes were marked for identification and the Commonwealth presented evidence to establish grounds for the tapes's admission.

Hammond testified that she had been employed by Safeway for twenty years. From her experience as head teller and as a food clerk, whose duties included scanning groceries at the checkstands, Hammond described scanning procedures as well as pricing procedures at Safeway. Her testimony established that every grocery item in the store has an individual bar code. When a customer buys groceries, each bar code on every item is pulled over a scanner that reads the bar code to determine the price charged for the item. The scanner has a red laser beam which must come into direct contact with the bar code in order for the scanner to read it. When the scanner reads the bar code, the cash register, which has the price of the item stored in its memory, "rings the item up"

displaying the item and its price on the register window and recording it on the cash register tape.

The previous Wednesday, Hammond had overseen the price changes at the Countryside Safeway. Every week, prices change at all Safeway stores. Safeway's item prices in its cash registers' memories are transmitted to it from a computer called a host machine, in Landover, Maryland. Each week, Safeway's new prices for each item are entered in the host machine, and the individual Safeway stores bring a "queue" containing the prices from the host machine into the store through its phone lines.[1] Once the queue is brought into the store, the item prices are stored in the cash registers' memories. The price changes affect all prices in the Safeway stores except when individual stores run in-store specials or the price changes are made at the last minute and are unable to get into the queue on time.

Thus, when an item is scanned, the amount that is recorded in the cash register and appears in the register display window and on the register's tape, represents the price which is charged for the item during that pricing period. When an order is completed, the cashier pushes the total button to arrive at the total amount Safeway is charging the customer for the entire order based on each item scanned.

At the end of each business day, the totals from the individual cash registers are used to determine the sales on all of the items throughout the store using a computer procedure that produces a detailed report. This procedure brings into account all the sales of each department via the cash registers, which track the movement of a particular item based on its unique bar code. The report, in turn, is checked against the actual money received and is used for other purposes, such as inventory and taxes.

Some grocery items, such as those from the meat department, deli, and bakery, are labeled with prices in addition to their individual bar codes. Hammond stated that this method

---

1. A queue is stored computer data waiting to be processed.

allowed her to verify the prices of most of the items from the man's cart which she had re-scanned. From her experience, Hammond stated that the cash register scanners usually display and record the correct price of items in the store.

Travers also testified that the scanners almost always reflect the correct price, unless the data has not been entered in the host machine or register, in which case the previous price of the item would appear. Travers further stated that a cash register could malfunction if a machine "jam[med] up." If this were the case, the register would not work at all and nothing would be read. However, there were no malfunctions observed on October 24, 1992.

The trial court ruled that the tapes were admissible under the business records exception to the hearsay rule. At the close of trial, Fitzhugh argued that no evidence proved that any money was missing from the cash register drawer and that the cash register tapes did not prove that she attempted to steal any money. In finding Fitzhugh guilty of attempted grand larceny, the trial court found that the logical inference from the evidence was that Fitzhugh failed to scan certain items to avoid having a record of them so the customer would not be charged for the items. The trial court also noted that the value of the items Hammond personally identified on the second tape, the prices of which she verified, totaled over $200.

█ In determining the admissibility of computer records, when the argument has been advanced that they are inadmissible hearsay, the Supreme Court of Virginia has employed the traditional business records exception to the hearsay rule. *See Kettler & Scott, Inc. v. Earth Tech. Cos.*, 248 Va. 450, 457, 449 S.E.2d 782, 785 (1994); *Frye v. Commonwealth*, 231 Va. 370, 387, 345 S.E.2d 267, 279 (1986).

"Under the modern Shopbook Rule, adopted in Virginia, verified regular entries may be admitted into evidence without requiring proof from the regular observers or record keepers," generally limiting admission of such evidence to "facts or events within the personal knowledge of the

recorder." ... However, this principle does not necessarily exclude all entries made by persons without personal knowledge of the facts recorded; in many cases, practical necessity requires the admission of written factual evidence that has a circumstantial guarantee of trustworthiness.

*Kettler*, 248 Va. at 457, 449 S.E.2d at 785 (citation omitted).

In *Frye*, the Court upheld the admission of computer printouts of verified regular entries made at the Virginia Division of Motor Vehicles and the National Crime Information Center without testimony from the original observers or record keepers because the entries were regularly prepared and relied upon by the professionals involved. 231 Va. at 387, 345 S.E.2d at 279. Recognizing that law enforcement officials rely on DMV records, the Court stated:

[A]n entry in the DMV records must necessarily be made by the official issuing a license, and such official, if called as a witness, could verify the computerized record from his own personal knowledge.

In certain cases, where verification of the recorded facts is not possible through the personal knowledge of the record keeper, practical necessity nevertheless requires admission of recorded evidence which has a circumstantial guarantee of trustworthiness; this guarantee is provided where evidence shows the regularity of the preparation of the records and reliance on them by their preparers or those for whom they are prepared.

*Id.* at 387, 345 S.E.2d at 279–80 (citations omitted). The Court held that the NCIC printout was also within the exception because an administrator of the West Virginia correctional center, from which Frye had escaped, testified that a felony warrant was executed July 28, 1984, upon his escape and filed with the NCIC, and a state trooper testified that records of the NCIC were routinely used and relied on by the Virginia State Police in the regular course of business. *Id.*

■ We believe that *Kettler* and *Frye* control this case. We hold that the cash register tapes were properly admitted into evidence under the business records exception to the

hearsay rule. Like the DMV and NCIC records in *Frye*, regular entries of Safeway's prices are made according to an item's bar code in Landover, Maryland. The entries made in the company's records are stored in its host machine and are called upon, via electronic transmissions, by the individual Safeway stores which rely on the prices recorded on the cash register tapes for the sale of grocery items for the company.

The cash register tapes relied upon by Safeway and its chain of stores serve numerous purposes. These purposes include checking a store's inventory and cash flow, tracking a particular item's movement and volume of sale, and reporting profits and losses for taxes, and other purposes. Additionally, the records are relied upon by the customers who shop at Safeway daily and are charged for groceries during a given pricing period based on the entries made in the host machine. Although, on occasion, there may be a discrepancy between an item's advertised price and what is actually charged for the item, this does not change the fact that the customers rely on the record entries made by Safeway. As with any records kept on computers that are continually updated, mistakes will be made necessitating correction.[2]

Thus, because the cash register tapes were properly admitted, the evidence presented was sufficient to convict Fitzhugh of attempted grand larceny. From the eyewitness testimony and the tapes, the trial judge properly inferred that out of the man's entire grocery order, totaling $426.22, Fitzhugh, in an attempt to hide the actual amount of items taken from the store, scanned only five deli items equaling $25.30. That the scanner in Fitzhugh's checkstand may have malfunctioned, not registering over $400 worth of groceries, and gone unnoticed by Fitzhugh, is a hypothesis of innocence unsup-

---

2. While we find that the evidence proved that the cash register tapes were trustworthy and reliable, we nevertheless distinguish the cash register tapes from those reports based on computer generated information because the cash register tapes are simply a repetition of prior recorded input. *See Tatum v. Commonwealth*, 17 Va.App. 585, 440 S.E.2d 133 (1994); and *Penny v. Commonwealth*, 6 Va.App. 494, 370 S.E.2d 314 (1988).

ported by the evidence. Furthermore, the man's five deli items scanned in Fitzhugh's lane exactly matched five deli items that were re-scanned by Hammond. Lastly, prices of certain items from the man's cart, worth over $200 in total, were personally verified by Hammond, thus supplying conclusive proof of the value of the items taken to prove a conviction of attempted grand larceny.

*Affirmed.*