COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Felton,[*] Judges Frank and Clements
Argued at Chesapeake, Virginia


LAWRENCE MCDOWELL
                                                          OPINION BY
v.        Record No. 2350-04-1          CHIEF JUDGE WALTER S. FELTON, JR.
                                                          APRIL 18, 2006
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Norman A. Thomas, Judge

Roy B. Martin, III (Office of the Public Defender, on brief), for
appellant.

Karri B. Atwood, Assistant Attorney General (Judith Williams
Jagdmann, Attorney General, on brief), for appellee.


Lawrence McDowell ("appellant") appeals his convictions of grand larceny in violation

of Code § 18.2-95, and larceny with the intent to sell or distribute stolen property in violation of

Code § 18.2-108.01, both arising out of the theft of over-the-counter medications from a

Rite-Aid store. Appellant argues that the trial court erred in admitting into evidence a "Box-List

Sheets Report,"[1] generated using a "Telethon gun,"[2] to establish the value of the stolen

merchandise, and that it erred in finding the evidence sufficient to convict him of the charges.

Finding no error, we affirm the judgment of the trial court.

_____

[*] On April 1, 2006, Judge Felton succeeded Judge Fitzpatrick as chief judge.

[1] The "Box-List Sheets Report" is a printed, computer-generated, report obtained by
Rite-Aid employees using the "Telethon gun." See Note 2.

[2] The "Telethon gun" is a hand-held computer device used by Rite-Aid employees to
maintain the store's inventory.

BACKGROUND

On the evening of May 24, 2004, Corey L. Woods ("Woods") was employed as a loss prevention officer at a Rite-Aid store in the City of Norfolk. Woods observed appellant park his car near the rear of the store, even though there were parking spots available near the front of the store. He then observed appellant and another male enter the store through its front door and proceed to Aisle 13, where over-the-counter medications were displayed. Woods, dressed in plain-clothes, observed appellant from the end of Aisle 13 as he and the man with him began "shoving" large quantities of merchandise from the shelves into their pants. He immediately called the Norfolk Police Department and alerted the store's assistant manager to the "shelf sweep."[3] He directed the assistant manager to lock the front door of the store, displayed his badge outside his clothing, and positioned himself near the cash register.

Appellant and his companion left Aisle 13, bypassed the cash register, and walked towards Woods. He stopped them and identified himself as a security agent for Rite-Aid. The two men became agitated and angry in response to Woods' presence. He displayed his stun gun and told them that the police were en route. He observed that their clothing looked "irregular" and heard the "rattling" sound of pills coming from the clothing of the two men as they ran towards the back of the store, leaving through the rear door in the stockroom. Woods immediately ran outside and noted the make and model of appellant's vehicle as appellant and his companion drove away. Woods followed them to Portsmouth, where he contacted the Portsmouth Police, but did not confront the two men.

Woods returned to Rite-Aid and observed that the section of Aisle 13 where he had observed the men was "totally obliterated," the "shelves were completely empty," and that there

_____

[3] Rite-Aid employees refer to shoplifting incidents, when a "large quantity of merchandise is missing," as "shelf sweeps."

were "gaps" and "holes" where merchandise should have been located. He then used the Telethon device to determine what merchandise was missing from the shelves, using the same device to generate a Box-List Sheets Report. The Box-List Sheets Report listed merchandise missing from Aisle 13 between the time Telethon employees conducted an inventory earlier that day and when he used the Telethon device on his return to the store after following appellant and his companion. The report listed item number, bar code, description, quantity, and store selling price for the merchandise missing from Aisle 13 where Woods earlier had observed the men removing the items.

The report produced by the Telethon device showed a large number of unsold items missing from the shelves, including four units of "TRIM SPA CARB BLKER," each valued at $29.99, for a total value of $119.90; four units of "TRIM SPA FAT BLKER," each valued at $29.99, for a total value of $119.90; three units of "ZANTREX-3," each valued at $49.00, for a total value of $147.00; six units of "TRIM SPA EF," each valued at $39.99, for a total value of $239.90; 22 units of "PRILOSEC," each valued at $10.99, for a total value of $241.70; and other items with a total value of $310.60. The Box-List Sheets Report reflected that $1,179.93 worth of merchandise was missing from the identified section of Aisle 13.

Appellant admitted at trial that he "inten[ded] [] to commit larceny" but when he saw Woods, he "took the stuff off [his person] and left it on the aisle." He also testified he was not accompanied by anyone else during this incident.

Over appellant's objection, the trial court admitted the Box-List Sheets Report into evidence as a business record and as "circumstantial evidence of a price [of items] on [that] particular date." Appellant was convicted of both charges. This appeal followed.

I.

ADMISSIBILITY OF THE BOX-LIST SHEETS REPORT

Appellant contends that the trial court erred in admitting the Box-List Sheets Report under the business records exception to the hearsay rule, arguing that the underlying inventory on which the report was based was not authenticated by a Telethon representative or a Rite-Aid store manager. He contends that, because the digital information stored in the Telethon device was not within Woods' personal knowledge, he was not qualified to authenticate the Box-List Sheets Report as a business record, and that it was therefore not admissible under that exception to the hearsay rule.

"[H]earsay evidence is inadmissible unless it falls within one of the recognized exceptions to the hearsay rule, and [] the party attempting to introduce a hearsay statement has the burden of showing the statement falls within one of the exceptions." Robinson v. Commonwealth, 258 Va. 3, 6, 516 S.E.2d 475, 477 (1999). "Virginia follows the modern 'shopbook' rule or business records exception to the hearsay rule, which allows introduction into evidence of verified regular [business] entries without requiring proof from the original observers or record keepers." Sparks v. Commonwealth, 24 Va. App. 279, 282, 482 S.E.2d 69, 70 (1997) (citation omitted). Moreover, "[t]he trustworthiness or reliability of [business] records is guaranteed by the regularity of their preparation and the fact that the records are relied upon in the transaction of business by the person or entities for which they are kept." Kettler & Scott, Inc. v. Earth Tech. Cos., Inc., 248 Va. 450, 459, 449 S.E.2d 782, 785-86 (1994) (citations omitted).

Here, the trial court admitted the Box-List Sheets Report, a computer-generated inventory report, generated by Woods using the hand-held computer device. We have previously held that "[i]n determining the admissibility of computer records . . . Virginia has employed the traditional

business records exception to the hearsay rule." Fitzhugh v. Commonwealth, 20 Va. App. 275, 280, 456 S.E.2d 163, 165 (1995). We have also noted that computer "records are admissible under the business records exception even though [the witness] did not make the computer entries nor was he the custodian of [] company records," because the witness "had knowledge of how [the] records were compiled and maintained, and he had access to those records as an integral part of his responsibilities as a fraud investigator for his employer." Lee v. Commonwealth, 28 Va. App. 571, 576, 507 S.E.2d 629, 629 (1998); see Simpson v. Commonwealth, 227 Va. 557, 566-67, 318 S.E.2d 386, 392 (1984) (where taxi meter recordings were found to be admissible through the testimony of a bookkeeper as circumstantial evidence to prove the amount of money a robbery victim had in his possession when the crime occurred); see also Jackson v. State, 877 So. 2d 816, 817 (Fla. Ct. App. 2004) ("[C]omputer printouts, like business records, are admissible if the custodian or other qualified witness is available to testify as to manner of preparation, reliability and trustworthiness."); F.D.I.C. v. Carabetta, 739 A.2d 311, 319 (Conn. App. Ct. 1999) ("What is crucial is not the witness' job description, but rather his or her knowledge of the basic elements that afford reliability and trustworthiness to computer printouts.").

The evidence proved that Rite-Aid maintained a computerized inventory in the regular course of its business, and regularly used the Telethon device to determine the status of its inventory. Woods testified that all Rite-Aid store cash registers were connected to the Telethon device, "a simple little hand []tool that the associates use, the cashiers use, the management use and myself and my partner use," and which was linked to the store's computer inventory. The Telethon device allowed Rite-Aid employees to scan merchandise to determine "what's on the shelf and what's at a store and what's on hand." The Telethon device tracked new inventory, as well as existing stock, and all Rite-Aid sales were automatically communicated to it. The

Telethon device used by Woods was also electronically linked to a printer, allowing Rite-Aid employees to generate a Box-List Sheets Report printout of the computer inventory on a particular aisle of the store.

On the date of the incident, Woods had been employed by Rite-Aid for eight years. He had been trained in the use of the Telethon device at Rite-Aid corporate headquarters to conduct inventory assessments and to track missing merchandise following theft incidents. He regularly used the Telethon device in the normal course of his employment for "four or five" years. In overruling appellant's contention that the report was improperly authenticated, the trial court specifically noted:

> The Court is going to admit the document under these circumstances especially with respect to Mr. Woods' training on the matter as routine access to these types of reports and his discussion of how the inventory is updated through the database so that they are ab[le] to rely on these documents . . . in the course of routine business transaction[s] or routine business operations of a Rite-Aid store. The court finds it is a business record.

We find that trial court did not err in admitting the Box-List Sheets Report under the business records exception to the hearsay rule.

II.

SUFFICIENCY OF THE EVIDENCE

> When examining a challenge to the sufficiency of the evidence, an appellate court must review the evidence in the light most favorable to the prevailing party at trial and consider any reasonable inferences from the facts proved. The judgment of the trial court is presumed to be correct and will be reversed only upon a showing that it is plainly wrong or without evidence to support it.

Viney v. Commonwealth, 269 Va. 296, 299, 609 S.E.2d 26, 28 (2005) (citations omitted).

Appellant contends that the evidence was insufficient to convict him because it failed to prove, as a matter of law, the value of the items stolen. He argues that, because the report did not reflect the possibility that some of the missing merchandise was on sale, the evidence was

insufficient as a matter of law to establish that the value of the merchandise taken exceeded $200.[4] No evidence was introduced that any item listed on the Box-List Sheets Report as missing from Aisle 13 was on sale. See Robinson, 258 Va. at 10, 516 S.E.2d at 479 (price tags regularly affixed to merchandise constitute *prima facie* evidence of value of goods under exception to hearsay rule).

Grand larceny occurs when a person "commits simple larceny not from the person of another of goods and chattels of the value of $200 or more." Code § 18.2-95. "In a grand larceny prosecution, the burden is upon the Commonwealth to prove beyond a reasonable doubt that the value of the goods stolen equals at least the amount fixed by statute in definition of the offense." Dunn v. Commonwealth, 222 Va. 704, 705, 284 S.E.2d 792, 792 (1981) (citations omitted). In Fitzhugh, we found that "the amount that is recorded in the cash register and appears in the register display window and on the register's tape, represents the price which is charged for the item during that pricing period." 20 Va. App. at 279, 456 S.E.2d at 165. Similarly, the computer inventory records stored in the Telethon device reflected the price on each of the items in the Rite-Aid store on the day of this incident.

The Box-List Sheets Report demonstrated that the total value of the missing merchandise from Aisle 13 was $1,179.63, well above the $200 statutory threshold for grand larceny. Even accepting appellant's contention that some items on the Box-List Sheets Report might not reflect the price of items on sale, the total amount of the items listed on the report as missing would have to be discounted by over 80% to reduce the value of the missing items to less than $200, a matter not supported by the record. Viewed in the light most favorable to the Commonwealth,

---

[4] Testimony established that any item on sale would be reduced in price at the sales register when scanned.

the record reflects sufficient evidence from which the trial court could infer beyond a reasonable doubt that appellant stole merchandise from Rite-Aid valued at $200 or more.

CONCLUSION

We find, from the record before us, that the trial court did not err in admitting the Box-List Sheets Report as a business records exception to the hearsay rule, and that credible evidence before the trial court was sufficient to convict appellant of grand larceny and larceny with the intent to sell or distribute stolen property.  Accordingly, we affirm the judgment of the trial court.

<u>Affirmed.</u>