COURT OF APPEALS OF VIRGINIA

Present: Judges O'Brien, Fulton and White

KEVIN BENITEZ SORTO

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 1129-24-2            JUDGE KIMBERLEY SLAYTON WHITE
                                                    AUGUST 19, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Steven C. McCallum, Judge

(Gregory R. Sheldon; BainSheldon, PLC, on brief), for appellant.

(Jason S. Miyares, Attorney General; Aaron J. Campbell, Assistant
Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court of Chesterfield County convicted Kevin Benitez

Sorto of first-degree murder as principal in the second degree and use of a firearm in the

commission of murder. Sorto asserts that the trial court erred by admitting a co-defendant's text

message under the "state of mind exception to the hearsay rule" when no evidence was presented

of a concert of action sufficient to attribute the message to him, that the trial court erred by

instructing the jury on concert of action, that the evidence was insufficient to prove he acted as a

principal in the second degree to murder and use of a firearm in the commission of murder, and

that the evidence was insufficient to prove the element of malice required for a murder

conviction. For the following reasons, we affirm Sorto's convictions.[1]

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] After examining the briefs and record in this case, the panel unanimously holds that oral
argument is unnecessary because "the appeal is wholly without merit." Code § 17.1-403(ii)(a);
Rule 5A:27(a).

BACKGROUND[2]

On July 2, 2022, Natalie Arriola was hosting a gathering at the Cultural Center of India ("Cultural Center") for her quinceañera. Her cousin, Joel Gonzalez, was invited to attend. At around 10:30 p.m., Chesterfield County Police Officer Jake Webster responded to the Cultural Center on a report of "shots fired" at that location. Upon his arrival, Officer Webster found Gonzalez in the Cultural Center lobby suffering from gunshot wounds to his chest and buttocks. Officer Webster performed CPR until paramedics arrived. Gonzalez was later pronounced dead at the scene. Gonzalez was 16 years old at the time of his death, and he often went by the nickname "Seppy."

Yoshi Ortiz was at the Cultural Center that evening and was in the lobby, near the entrance, at around 10:20 p.m. The bathrooms were located to his left. As he and his friends sat talking, Ortiz noticed three young men wearing hoodies enter the Cultural Center. The young men, later identified as Sorto, Brayan Izaguirre-Cuellar, and David Reyes, immediately made a "beeline" to the bathrooms. A fourth individual, later identified as Yahir Barrientos, was already at the Cultural Center and joined them. Ortiz did not know any of the young men. When Gonzalez started walking toward the bathroom, Ortiz's friend said, "something is about to happen" and suggested that Ortiz "go record." Ortiz started recording on his phone as he followed the young men into the bathroom. From the doorway, Ortiz observed a fight between Gonzalez and Sorto. Gonzalez did not have a weapon, but Ortiz noticed that Sorto, Reyes, and

---

[2] On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth, the prevailing party in the circuit court." *Konadu v. Commonwealth*, 79 Va. App. 606, 610 n.1 (2024) (quoting *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Id.* (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

Izaguirre-Cuellar each held firearms. During the fight, Sorto struck Gonzalez multiple times with his gun. Ortiz ran from the bathroom when shots were fired.

Rodney White was in the lobby of the Cultural Center with Gonzalez when the three men wearing hoodies arrived. Prompted by Gonzalez, White followed the men into the bathroom. When he entered the bathroom, White saw that the men were armed. He later testified that Gonzalez and Sorto began to fight. He then stated that, a second later, Reyes stepped out of a stall, moved Sorto out of the way and "proceeded to fire" his weapon. White testified that Gonzalez was not armed. When asked who started the fight, White said, "it was a mix between [Sorto] and [Gonzalez]."

Andrew Carrillo was sitting in the lobby with Ortiz when Sorto and his friends walked in wearing hoodies. Carrillo followed the men to the bathroom "to see what was going on" and observed Gonzalez and Sorto fighting. Carrillo saw that Sorto and Reyes each held a gun in his hand. When Sorto and Reyes both displayed their weapons, he left the bathroom. As he ran toward the back exit, Carrillo heard gunshots. He then waited in the woods outside until the police arrived.

Chesterfield County Police Detective Christopher Guice responded to the Cultural Center to investigate. Detective Guice located Gonzalez's body, spoke with witnesses, and reviewed video-surveillance from the Cultural Center lobby. The video showed Sorto, Reyes, and Izaguirre-Cuellar together walking into the Cultural Center at around 10:29 p.m. and heading toward the bathrooms. Barrientos then joined them. Gonzalez and White next followed the group into the bathroom, along with six to ten other people attending the party. Moments later, several people hastily exited the bathroom and ran in different directions. Sorto was the last person to exit the bathroom and was stopped by sheriff's deputies. After speaking briefly with the deputies, Sorto left the Cultural Center through the front door. Reyes, Barrientos, and

Izaguirre-Cuellar ran into the ballroom as Gonzalez fell to the floor. By the time Detective Guice arrived, none of the suspects involved in the shooting remained at the Cultural Center.

Chesterfield County Forensic Investigator Grace Laramore processed the crime scene. Investigator Laramore took photographs of the area and then recovered multiple cartridge cases and metal fragments in the area of the men's bathroom. She also diagramed the scene. In the bathroom, Investigator Laramore found five 9mm and three .22 caliber cartridge casings, 11 bullet fragments, and a bullet. She found and marked three "defects" that were on the ground, the walls, and the door. Investigator Laramore transported the ballistics evidence to the police department for later analysis by the Department of Forensic Science ("DFS").

On July 3, 2022, Investigator Laramore executed a search warrant at Reyes's residence. From a black backpack found at that location, Investigator Laramore recovered a red hoodie, a pair of socks with red stains, a white tank top with a red stain, a pair of distressed jeans, a box of 9mm Laser cartridges, a box of .22 caliber cartridges, an empty box of .22 caliber cartridges, and a 9mm Glock magazine with a reloader. The backpack also held Reyes's driver's license. A second backpack held a pair of jeans with a belt, a sweatshirt, and pay stubs for Barrientos. Investigator Laramore found a P80 .22 caliber handgun underneath a mattress in one of the bedrooms. The firearm was sent to DFS for analysis.

Chesterfield County Detective K.J. King testified as an expert in the examination of digital forensic evidence. Detective King analyzed Barrientos's phone and extracted a text message Barrientos sent to a person saved in his phone as "Derek" at 10:22 p.m. on July 2, 2022. The messages said, "Skeepy and mbk here." Five seconds later he sent another text message to "Derek" that said, "we are waiting to strike." Detective King admitted that nothing about those text messages associated them with Sorto.

- 4 -

Sorto objected to the admission of the text messages as inadmissible hearsay. The Commonwealth argued that the text messages were admissible under the "present sense impression" and "state of mind" exceptions to the rule against hearsay. Sorto disagreed and argued that the text messages did not satisfy the requirements of the present sense impression exception because they did not describe any event that was occurring and were not spontaneous. Sorto also argued that the message "we are waiting to strike" was not relevant to his state of mind because the message was not tied to him and there was no proof of concert of action. After further argument, the trial court found that the text stating "Skeepy and mbk here" fell under the present sense impression exception to the rule against hearsay and that the text message stating "we are waiting to strike" fell under the state of mind exception. The trial court admitted the text messages at trial.

Assistant Chief Medical Examiner Jeffrey Gofton performed Gonzalez's autopsy. He opined that Gonzalez died of a lethal gunshot wound to the chest. That bullet passed through the left lung, the heart, the aorta, the right lung, and then exited on the right side of the chest. Gonzalez also suffered a gunshot wound to the left shoulder and one to the left buttock. Dr. Gofton removed a fragmented bullet from Gonzalez's torso. Another bullet was found in his pelvic region. Dr. Gofton gave the bullets to the Chesterfield County Police Department. They were later sent to DFS for analysis.

Forensic Scientist James Bullock testified as an expert in firearms examination. Bullock received five 9mm cartridge cases, three .22 caliber cartridge cases, the Polymer 890 Model 940 .22 caliber semiautomatic pistol, three bullet jacket fragments, and three bullets for testing. Bullock concluded that the three .22 caliber cartridge cases, a bullet found at the scene, and one of the two bullets that were recovered from Gonzalez's body at his autopsy were fired from the .22 caliber Polymer pistol that was found at Reyes's house. The second bullet recovered from

Gonzalez's body during his autopsy "exhibit[ed] similar general rifling class characteristics as those produced" by the Polymer pistol, but they were "unsuitable for identification with any firearm due to the lack of microscopic markings for comparison." Bullock also concluded that the five 9mm Luger cartridge cases found at the crime scene were fired from the same weapon and therefore opined that at least two firearms were used in the shooting.

After the Commonwealth rested, Sorto moved to strike the evidence and argued that there was no evidence he acted as a principal in the second degree to the shooting. He also argued no evidence proved concert of action. Following the arguments of counsel, the trial court denied the motion to strike.

Huberth Mejia testified that he rode to the Cultural Center on July 2, 2022, with Reyes, Izaguirre-Cuellar, and Barrientos. He said that Sorto arrived separately about 20 minutes later. Mejia testified that on the way to the party no one said anything about Gonzalez, no one mentioned a firearm, and no one mentioned a fight. He and Barrientos entered the Cultural Center before Sorto arrived and then went back outside to the parking lot upon Sorto's arrival. Mejia denied saying anything to Sorto about Gonzalez or telling him that Gonzalez was attending the party. He said that after he and Barrientos reentered the Cultural Center, Sorto, Reyes, and Izaguirre-Cuellar entered and went straight to the bathroom. He and Barrientos followed. Mejia testified that Gonzalez entered the bathroom and began hitting Sorto from behind before the two started fighting. Mejia did not see a gun in Sorto's hand. He testified that Reyes then came out of a stall and moved Sorto aside before Mejia heard gunshots and fled. He explained that after the shooting, he and Sorto left together and went to a friend's house. Barrientos, Reyes, and Izaguirre-Cuellar joined them later that night.

After Mejia testified, Sorto renewed his motion to strike, again arguing that the evidence failed to prove concert of action between himself, Izaguirre-Cuellar, Barrientos, and Reyes, or

that he acted as a principal in the second degree to murder. The trial court denied the renewed motion to strike.

The Commonwealth proposed a jury instruction on concert of action that read as follows:

> If there is concert of action, with the resulting crime one of its incidental probable consequences, then whether such crime was originally contemplated or not, all who participate in any way in bringing it about, are equally answerable and bound by the acts of every other person connected with the consummation of such resulting crime.

Sorto objected to the instruction on the basis that no evidence was presented of "any kind of plan or purpose . . . other than to go to the party." The trial court found there was "appreciable evidence" of concert of action supporting the giving of the instruction and overruled Sorto's objection.

Following closing arguments, the jury deliberated and later convicted Sorto of first-degree murder and use of a firearm in the commission of murder. Sorto appeals.

ANALYSIS

The text message

"[T]he determination of the admissibility of relevant evidence is within the sound discretion of the trial court subject to the test of abuse of that discretion." *Adjei v. Commonwealth*, 63 Va. App. 727, 737 (2014) (alteration in original) (quoting *Beck v. Commonwealth*, 253 Va. 373, 384-85 (1997)). "This bell-shaped curve of reasonability governing our appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Thomas v. Commonwealth*, 62 Va. App. 104, 111-12 (2013) (quoting *Hamad v. Hamad*, 61 Va. App. 593, 607 (2013)). A reviewing court can conclude that "an abuse of discretion has occurred" only in cases in which "reasonable jurists could not differ" about the correct result. *Commonwealth v. Swann*, 290 Va. 194, 197 (2015) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). "[B]y definition,"

however, a trial court "abuses its discretion when it makes an error of law." *Coffman v. Commonwealth*, 67 Va. App. 163, 166 (2017) (quoting *Commonwealth v. Greer*, 63 Va. App. 561, 568 (2014)).

Sorto argues that Barrientos's text message to "Derek" stating "we are waiting to strike" was irrelevant and inadmissible because there was no evidence of any concert of action by which the trial court could connect Barrientos's state of mind to Sorto's later actions.[3] We disagree.

"Hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" *Jones v. Commonwealth*, 71 Va. App. 597, 604 (2020) (quoting Va. R. Evid. 2:801(c)). "If a statement is offered for any purpose other than to prove the truth or falsity of the contents of the statement, such as to explain the declarant's conduct or that of the person to whom it was made, it is not objectionable as hearsay." *Id.* (quoting *Hamm v. Commonwealth*, 16 Va. App. 150, 156 (1993)). Accordingly, "[d]etermining whether a statement is offered to prove the truth or falsity of the matter asserted requires an analysis of the purpose for which the statement is offered into evidence." *Swain v. Commonwealth*, 28 Va. App. 555, 559 (1998). "[I]f a statement is not offered for its truth, it is not . . . hearsay." *Bennett v. Commonwealth*, 69 Va. App. 475, 489 (2018). If a statement *is* offered for its truth, it is hearsay and thus "inadmissible unless it falls within one of the recognized exceptions" to the hearsay rule. *Melick v. Commonwealth*, 69 Va. App. 122, 133 (2018) (quoting *McDowell v. Commonwealth*, 48 Va. App. 104, 109 (2006)); *see also* Va. R. Evid. 2:802. The Commonwealth does not dispute that the text message "we are waiting to strike" was offered for its truth.

---

[3] Sorto does not challenge the trial court's ruling on the text message that said, "Skeepy and mbk here."

Under the "state of mind" exception, "[a] statement of the declarant's then existing state of mind" such as "intent, plan, [or] motive" need not be excluded from the evidence. Va. R. Evid. 2:803(3). That is, "[i]f the declarant's state of mind is relevant to the case, then admissions of the declarant's mental state are admissible, providing that they 'refer to a presently existing state of mind' and there is 'no obvious indication of falsification or contrivance.'" *Evans-Smith v. Commonwealth*, 5 Va. App. 188, 197 (1987) (quoting C. Friend, *The Law of Evidence in Virginia* § 238 (2d ed. 1983)). "'Relevant evidence' means evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401.

Here, Barrientos's message "we are waiting to strike" was indicative of his understanding that he, with others, intended to render an attack of some sort, and the text message immediately preceding that message tellingly stated that "Skeepy" was at the party.[4] Sorto's own witness, Mejia, testified that he rode separately with Izaguirre-Cuellar, Reyes, and Barrientos to the Cultural Center and that they knew Sorto was on the way. When they arrived, Barrientos parked his Honda Civic and with Mejia entered the Cultural Center. At 10:22 p.m., Barrientos sent the text message to "Derek" indicating that "Skeepy and mpk here." Four seconds later, Barrientos sent another message to "Derek" stating "*we* are waiting to strike." (Emphasis added). At 10:24 p.m., Mejia and Barrientos exited the Cultural Center to meet Sorto—who by then had arrived—in the parking lot. Barrientos and Mejio then reentered the Cultural Center at 10:28 p.m. and lingered in the lobby. At 10:29 p.m., Sorto, Izaguirre-Cuellar, and Reyes entered the lobby and made a "beeline" for the bathrooms. Barrientos and Mejia immediately followed, and Gonzalez and White followed along behind them, together with several other people who

---

[4] We do not find that by "Skeepy," Barrientos referred to anyone other than Gonzalez, who went by the nickname "Seppy." A reasonable fact finder could conclude that the text message contained a mere typo.

surmised that "something [was] about to happen." Moments later, shots were fired, and Gonzalez was dead.

It was reasonable to infer from these facts that Barrientos, Izaguirre-Cuellar, Reyes, and Sorto acted in concert when they attended Natalie's quinceañera uninvited and unannounced, confirmed that Gonzalez was at the party, met up in the parking lot, and then entered the Cultural Center within seconds of each other, only to walk directly to the bathroom, where Reyes, Sorto, and Izaguirre-Cuellar soon brandished their firearms during what started as an apparent fistfight between Sorto and Gonzalez. Barrientos's text "*we* are waiting to strike" was therefore indicative of the group's intention to confront and, at a minimum, assault Gonzalez, and that each member of the group shared that intent. "Evidence relating to a point properly at issue in a case is relevant and, therefore, admissible if it has 'any logical tendency, however slight,' to establish that point." *Church v. Commonwealth*, 71 Va. App. 107, 123 (2019) (quoting *Ragland v. Commonwealth*, 16 Va. App. 913, 918 (1993)). The text message was relevant to prove that when they entered the bathroom, Sorto and his friends intended to assault Gonzalez and, indeed, they did assault Gonzalez—in fact, they killed him.

We conclude that the text message referred to the presently existing state of mind of each member of the group as a whole and was not contrived. Because the text message was admissible under the state of mind exception to the hearsay rule and was relevant proof of the intent of the actions of Sorto and the others, the trial court did not abuse its discretion by admitting the text message into evidence at trial.

Jury instruction on concert of action

Granting or denying jury instructions "rest[s] in the sound discretion of the trial court." *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009). "A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions

cover all issues which the evidence fairly raises.'" *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). "[J]ury instructions must be supported by 'more than a scintilla of credible evidence.'" *Jones v. Commonwealth*, 71 Va. App. 70, 94 (2019) (quoting *Woods v. Commonwealth*, 66 Va. App. 123, 130 (2016)). "Whether there is more than a mere scintilla of evidence is determined on a case-by-case basis." *Id.* "Upon review, the evidence must be viewed in the light most favorable to the proponent of the instruction." *Mayberry v. Commonwealth*, 66 Va. App. 93, 101 (2016).

This Court has defined concert of action as an "[a]ction that has been planned, arranged, adjusted, agreed on and settled between the parties acting together pursuant to some design or scheme." *Rollston v. Commonwealth*, 11 Va. App. 535, 542 (1991) (alteration in original) (quoting *Black's Law Dictionary* 262 (5th ed. 1979)).

> [E]veryone connected with carrying out a common design to commit a criminal act is concluded and bound by the act of any member of the combination, perpetrated in the prosecution of the common design. But it is not necessary that the crime committed shall have been originally intended. Each is accountable for all the acts of the others done in carrying out the common purpose, whether such acts were originally contemplated or not, if they were the natural and proximate result of carrying out such purpose . . . .

*Velez-Suarez v. Commonwealth*, 64 Va. App. 269, 280 (2015) (alterations in original) (quoting *Boggs v. Commonwealth*, 153 Va. 828, 836 (1929)). "[I]t is not necessary that the crime [committed] should be a part of the original design; it is enough if it be one of the incidental probable consequences of the execution of that design, and should appear at the moment to one of the participants to be expedient for the common purpose." *Thomas v. Commonwealth*, 279 Va. 131, 157 (2010) (quoting *Brown v. Commonwealth*, 130 Va. 733, 738 (1921)). In other words, "[a]ll participants in such planned enterprises may be held accountable for incidental crimes committed by another participant during the enterprise even though not originally or specifically designed." *Berkeley v. Commonwealth*, 19 Va. App. 279, 283 (1994).

Sorto argues that the evidence failed to prove he, Izaguirre-Cuellar, Reyes, and Barrientos planned, arranged, or intended to pursue any one scheme or to commit any particular offense warranting a concert of action jury instruction. However, as we have already observed, the evidence showed that these four young men all attended a party to which they were not invited, that they waited for each other in the parking lot, that they entered the Cultural Center together, that they walked directly to the bathrooms in what could only be described as a "beeline," and that Sorto, Izaguirre-Cuellar, and Reyes all brandished their weapons during what the unarmed Gonzalez presumably thought was only supposed to be a fist fight. Moreover, Barrientos had sent text messages to "Derek" indicating that "Skeepy" was at the party and the group was waiting to "strike." Evidence collected at the crime scene suggested that two firearms were used in the shooting, and the testimony indicated that Sorto and his friends fled the crime scene at the same time and later met back up at a friend's house.

From this evidence, a reasonable fact finder could conclude that Sorto, Izaguirre-Cuellar, Reyes, and Barrientos planned together to assault Gonzalez and that they intended, if necessary, to use their weapons to accomplish that goal. Because more than a scintilla of credible evidence supported a finding that Sorto acted in concert with Izaguirre-Cuellar, Reyes, and Barrientos, the trial court did not abuse its discretion by granting the instruction.

Sufficiency of the evidence

When reviewing the sufficiency of the evidence, "[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). In such cases, "[t]he Court 'does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt."'" *Id.* (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "'Rather, the relevant question is,' upon review of the evidence in the

light most favorable to the prosecution, 'whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Dietz v. Commonwealth*, 294 Va. 123, 132 (2017)).

A. First-degree murder and use of a firearm in the commission of murder as a principal in the second degree

First-degree murder includes, among other things, "murder . . . by any willful, deliberate, and premeditated killing." *Commonwealth v. Herring*, 288 Va. 59, 77 (2014) (quoting Code § 18.2-32). "Premeditated murder . . . contemplates: (1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent." *Fields v. Commonwealth*, 73 Va. App. 652, 674 (2021) (alteration in original) (quoting *Rhodes v. Commonwealth*, 238 Va. 480, 486 (1989)). "Because 'premeditation and formation of an intent to kill seldom can be proved by direct evidence[,] [a] combination of circumstantial factors may be sufficient.'" *Aldridge v. Commonwealth*, 44 Va. App. 618, 655 (2004) (alterations in original) (quoting *Rhodes*, 238 Va. at 486). "The intent to kill must come into existence at some time before the killing[,] [but] it need not exist for any particular length of time." *Epperly v. Commonwealth*, 224 Va. 214, 231 (1982) (quoting *Smith v. Commonwealth*, 220 Va. 696, 700 (1980)). "A design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Id.* (quoting *Giarratano v. Commonwealth*, 220 Va. 1064, 1074 (1980)). "[E]vidence of a mortal wound inflicted by a deadly weapon with little or no provocation creates an inference from which the trier of fact may conclude that the killer acted with premeditation." *Morris v. Commonwealth*, 17 Va. App. 575, 578 (1994) (citing *Hodge v. Commonwealth*, 217 Va. 338, 343 (1976)).

"In the case of every felony, every principal in the second degree . . . may be indicted, tried, convicted and punished in all respects as if a principal in the first degree," except in certain

- 13 -

homicide offenses.  Code § 18.2-18.  "A principal in the first degree is the actual perpetrator of the crime.  A principal in the second degree, or an aider or abettor as he is sometimes termed, is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime."  *Farmer v. Commonwealth*, 61 Va. App. 402, 414-15 (2013) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 482 (2005)).

"To find a defendant guilty as a principal in the second degree, the Commonwealth must establish that the defendant procured, encouraged, countenanced, or approved the criminal act."  *McMorris v. Commonwealth*, 276 Va. 500, 505 (2008).  "It is a well-settled rule that a defendant is guilty as a principal in the second degree if he is guilty of some overt act done knowingly in furtherance of the commission of the crime, or if he shared in the criminal intent of the principal committing the crime."  *Id.*; Code § 18.2-18.  To share in criminal intent "has been interpreted to mean that 'the accused must either know or have reason to know of the principal's criminal intention and must intend to encourage, incite, or aid the principal's commission of the crime.'"  *Rollston*, 11 Va. App. at 540 (quoting *McGhee v. Commonwealth*, 221 Va. 422, 427 (1980)).

"Mere presence when a crime is committed is, of course, not sufficient to render one guilty as aider or abettor."  *Pugliese v. Commonwealth*, 16 Va. App. 82, 93 (1993) (quoting *Foster v. Commonwealth*, 179 Va. 96, 99 (1942)).  However, "proof that a person is present at the commission of a crime without disapproving or opposing it, is evidence from which, in connection with other circumstances," a fact finder could infer "that he assented thereto, lent to it his countenance and approval, and was thereby aiding and abetting the same."  *Id.* at 93-94 (quoting *Foster*, 179 Va. at 100).  "The test is whether or not [appellant] was encouraging, in citing [sic], or in some manner offering aid in the commission of the crime.  If he was present lending countenance, or otherwise aiding while another did the act, he is an aider and abettor or

- 14 -

principal in the second degree." *Farmer*, 61 Va. App. at 415 (second alteration in original) (quoting *Muhammad*, 269 Va. at 482).

Finally, "[t]he Commonwealth can, and most often must, present circumstantial evidence to prove that a defendant aided or abetted in the commission of a crime." *McMorris*, 276 Va. at 506. "On appeal, '[c]ircumstantial evidence is not "viewed in isolation" because "the combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable [fact finder]" to conclude beyond a reasonable doubt that a defendant is guilty.'" *Clark v. Commonwealth*, 78 Va. App. 726, 751 (2023) (alterations in original) (quoting *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019)). Such evidence "is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Id.* at 751-52 (quoting *Holloway v. Commonwealth*, 57 Va. App. 658, 665 (2011) (en banc)).

Sorto argues that the evidence failed to prove he did anything on the night of the offense to contribute to Gonzalez's murder. He claims that Gonzalez started the fight, and that while he may have held a gun during the incident, the evidence failed to show that he fired his weapon or that Gonzalez suffered any injuries consistent with being hit with a gun itself. Sorto also claims he did not know that Izaguirre-Cuellar and Reyes possessed or intended to use their firearms, especially because they stood behind him during the incident. In actuality, however, the evidence proved that Sorto separately met up with Izaguire-Cuellar, Reyes, and Barrientos at the Cultural Center shortly before the murder. Although it was July, Sorto and his friends donned long-sleeved hoodies in an obvious attempt to conceal their identities and the fact that they carried weapons. They entered the Cultural Center together and walked straight to the bathroom. Sorto held a firearm in his hand during the fight and used it repeatedly to strike Gonzalez. Barrientos's text messages showed that Sorto and his friends intended a "strike" on Gonzalez,

who was not armed. During the fight, Reyes and Izaguire-Cuellar brandished their own weapons, and Ortiz saw Reyes move Sorto out of the way before "proceed[ing] to fire." Indeed, one of the bullets recovered from Gonzalez during his autopsy was fired from the same .22 caliber weapon found under a mattress in Reyes's house.

After the shooting, and as Gonzalez fell to the ground, Sorto, Reyes, Barrientos, and Izaguire-Cuellar fled. Notably, despite encountering deputies upon his exit from the bathroom, Sorto did not remain at the crime scene, explain what had happened, or provide information about the shooter. Instead, he left the Cultural Center and then met up with his friends again later that night. "A person's 'flight from a crime scene . . . generally cannot be explained in terms of innocent human behavior.'" *Walker v. Commonwealth*, 79 Va. App. 737, 749 (2024) (alteration in original) (quoting *Jones v. Commonwealth*, 279 Va. 52, 58 (2010)). "[A]n accused's flight, . . . and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." *Id.* (second alteration in original) (quoting *Langhorne v. Commonwealth*, 13 Va. App. 97, 102 (1991)).

The evidence additionally showed that two firearms were used in the shooting and while the evidence did not prove Sorto fired his weapon, it also did not disprove it. Indeed, multiple shots were fired from at least two separate handguns, and Gonzalez suffered from three gunshot wounds, only one of which was identified affirmatively as being fired from Reyes's .22 caliber pistol. Ortiz's video showed that Sorto brandished his own firearm during the fight as his friends stood closely by with their weapons raised and pointed at Gonzalez. Thus, even if Sorto did not enter the bathroom with the specific intention of killing Gonzalez, the evidence showed that he was armed with a weapon and present during the commission of the assault upon Gonzalez and that he ultimately incited and encouraged the willful, deliberate, and premeditated murder committed by one, or both, of his friends.

In short, the combined force of these concurrent and related circumstances could lead a reasonable fact finder inevitably to the conclusion that Sorto was present during the murder and that he did not disapprove or oppose it, but, in fact, encouraged it. We therefore reject Sorto's contention that he was an innocent bystander to the unforeseen actions of Reyes, Izaguire-Cuellar, and Barrientos and we instead find that the jury did not err in concluding that Sorto was equally responsible for Gonzalez's foreseeable death. Contrary to Sorto's assertion, the evidence sufficiently proved he acted as a principal in the second degree to first-degree murder and use of a firearm in the commission of murder.

B. Malice

"Malice inheres in the 'doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will.'" *Alston v. Commonwealth*, 77 Va. App. 639, 648 (2023) (quoting *Tizon v. Commonwealth*, 60 Va. App. 1, 11 (2012)). "It exists when a person commits 'any purposeful and cruel act without any or without great provocation.'" *Id.* (quoting *Fletcher v. Commonwealth*, 72 Va. App. 493, 507 (2020)). Malice "may be directly evidenced by words, or inferred from acts and conduct which necessarily result in injury." *Ramos v. Commonwealth*, 71 Va. App. 150, 162 (2019) (quoting *Burkeen v. Commonwealth*, 286 Va. 255, 259 (2013)). "Whether an accused acted with malice 'is generally a question of fact and may be proved by circumstantial evidence.'" *Logan v. Commonwealth*, 67 Va. App. 747, 756 (2017) (quoting *Knight v. Commonwealth*, 61 Va. App. 148, 156 (2012)).

Malice may also "be inferred 'from the deliberate use of a deadly weapon.'" *Palmer v. Commonwealth*, 71 Va. App. 225, 237 (2019) (quoting *Doss v. Commonwealth*, 23 Va. App. 679, 686 (1996)). "A deadly weapon is one which is likely to produce death or great bodily injury from the manner in which it is used, and whether a weapon is to be regarded as deadly often depends more on the manner in which it has been used than on its intrinsic character."

*Hampton v. Commonwealth*, 34 Va. App. 412, 419 (2001) (quoting *Pannill v. Commonwealth*, 185 Va. 244, 254 (1946)). "Generally, unless a weapon is per se a deadly one, the fact finder should determine whether it, and the manner of its use, place it in that category, and the burden of showing these things is upon the Commonwealth." *Id.* at 420 (quoting *Pritchett v. Commonwealth*, 219 Va. 927, 929 (1979)).

Sorto contends that the evidence failed to prove he acted with the requisite element of malice supporting his first-degree murder conviction. He maintains that Gonzalez started the fight and therefore that the evidence at best proved voluntary manslaughter. The jury rejected this contention, as do we.

A "theory of innocence must flow from the evidence, and not from the ruminations of defense counsel." *Jones v. Commonwealth*, 21 Va. App. 435, 442 (1995) (quoting *Mullis v. Commonwealth*, 3 Va. App. 564, 574 (1987)). The Commonwealth is not required to "negate what 'could have been' or what was a 'possibility.'" *Nelson v. Commonwealth*, 281 Va. 212, 218 (2011). "Whether [a] hypothesis of innocence is reasonable is itself a 'question of fact' subject to deferential appellate review." *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004) (quoting *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004)). "When examining an alternate hypothesis of innocence, the question is not whether 'some evidence' supports the hypothesis, but whether a rational factfinder could have found that the incriminating evidence renders the hypothesis of innocence unreasonable." *White v. Commonwealth*, 68 Va. App. 241, 252 (2017) (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 250 (2016)). "In practical terms, this means that—even if not '*inherently* incredible'—a defendant's exculpatory version of events need not be accepted by the factfinder." *Tizon*, 60 Va. App. at 12-13 (quoting *Montgomery v. Commonwealth*, 221 Va. 188, 190 (1980)).

The record contains no appreciable evidence that Sorto and his friends acted in the heat of passion or responded in self-defense. By all accounts, Gonzalez was unarmed and surrounded by Sorto, Reyes, Izaguirre-Cuellar, and Barrientos. Sorto, Reyes, and Izaguirre-Cuellar each brought a weapon to the fight. Although Mejia testified that Gonzalez started the fight by hitting Sorto on the back of the head, White testified that the fight was started by a "mix" of both men. Ortiz's video shows that Sorto pushed Gonzalez against the wall and struck him repeatedly with his gun, while Izaguirre-Cuellar and Reyes stood by with their weapons raised and pointed. The videorecording then captured Reyes moving Sorto out of the way and firing his weapon. The evidence further showed that Sorto or Izaguirre-Cuellar, or both, also fired a weapon during the incident. Three bullets struck Gonzalez, one proving fatal. Rather than assisting Gonzalez or remaining at the scene, Sorto fled and later met up with his co-defendants at a friend's house. None of the young men called the police or sought medical assistance for Gonzalez as he lay dying on the lobby floor. On these facts, we cannot conclude that the jury erred by rejecting Sorto's assertion that he acted in the heat of passion and in self-defense. The evidence was sufficient to prove that Gonzalez's murder was malicious.

Accordingly, we find that the evidence was sufficient to prove that Sorto acted as a principal in the second degree to first-degree murder and use of a firearm in the commission of murder. We will therefore affirm his convictions.

## CONCLUSION

For these reasons, the trial court's judgment is affirmed.

*Affirmed.*